**UNION MUTUAL FIRE INSURANCE COMPANY,**

**Plaintiff,**

**Case #:**
**25-cv-02652-OEM-CLP**

**v.**

**SUBIN ASSOCIATES, LLP,**
**SUBIN & ASSOCIATES, LLC,**
**SUBIN, LLP,**
**ERIC SUBIN, PLLC,**
**HERBERT S. SUBIN,**
**ARNOLD BAUM,**
**ERIC SUBIN,**
**CLAY M. EVALL, ESQ. P.C.,**
**CLAY M. EVALL,**
**LAW OFFICES OF GARY S. PARK, P.C.,**
**GARY S. PARK,**
(*"Legal Service Defendants"*)

**JOHN DOE RUNNERS NOS. 1-25,**
**J. HERNANDEZ ASSOCIATES JR., INC.,**
**JOSE HERNANDEZ,**
**WALL STREET CLERICAL AND OFFICE SERVICES INC.,**
**WALL STREET CALENDAR SERVICES INC.,**
**WALL STREET TRANSPORTATION SERVICES, INC.,**
**WALL STREET INVESTIGATIONS INC.,**
**WALK STREET INVESTIGATIONS INC.,**
**WALL STREET CHECK CASHING INC.,**
**MEDICAL EXAM GUARDIANS INC.,**
**GERALDINE DELEON,**
**LUIS F. DELEON,**
**JORGE ARTURO GONZALEZ LUPI,**
**J & D INVESTIGATION SERVICES CORP.,**
**AMEDICO LEGAL, LLC,**
**AMEDICOLEGAL FUNDING, LLC,**
**AMEDICO LEGAL NETWORK, LLC,**
**AMEDICO HOLDCO, LLC,**
**MARYSELA K. SALINAS,**
**M.K.S. CONSULTANTS INC. d/b/a**
**LATINOS LEGAL CONNECTIONS,**
**JUSTICIA INC.,**

FIRST AMENDED COMPLAINT

1

**SAHIWAL ASSOCIATES, INC. (NJ),**
**SAHIWAL ASSOCIATES, INC. (NY),**
**TRI-STATE MEDICAL LIAISON SERVICES, INC.,**
**TANVIR CHAUDHRY,**
**ELSIE REAL CIBBARELLI,**
**XYZ SUPPORT CORPORATION NOS. 1-25,**
(*"Runner/Support Defendants"*)


**PEGASUS LEGAL CAPITAL, LLC,**
**PEGASUS FUND LLC,**
**PSC LIAISONS, LLC,**
**GREGORY ELEFTERAKIS,**
**CASECASH FUNDING, LLC,**
**CASE CASH GP, LLC,**
**CORONA 55 FUNDS, INC.,**
**CORONA 55 INC.,**
**WALL STREET CASE ADVANCES INC.,**
**NEAL MAGNUS,**
**BEST CASE ORIGINATIONS, LLC,**
**BEST CASE ORIGINATIONS D, LLC,**
**RL SPV, LLC,**
**XYZ FUNDING CORPORATION NOS. 1-25,**
(*"Funding Defendants"*)


**BESTCARE PHYSICAL THERAPY AND**
**CHIROPRACTIC, PC,**
**MAXIM ORTHOPAEDICS PLLC s/d/b/a**
**MAXIMUM ORTHOPEDICS s/d/b/a**
**WORKERSCOMPENSATIONDRS.COM,**
**MAXIM TYORKIN, M.D.,**
**ALL BORO MEDICAL REHABILITATION PLLC,**
**KEVIN H. WEINER, M.D.,**
**FELIX KARAFIN, M.D.,**
**RJR MEDICAL P.C.,**
**URBAN HEIGHTS MEDICAL, PC,**
**ALBERT J. CIANCIMINO, M.D.,**
**NY ORTHOPEDICS, P.C.**
**s/d/b/a SPINECARENYC,**
**MICHAEL GERLING, M.D.,**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES,**
**P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS**
**ORTHOPAEDIC SPECIALISTS,**
**KENNETH MCCULLOCH-OTERO, M.D.,**

**SANFORD R. WERT, M.D.,**
**SANFORD R. WERT, M.D., PC,**
**JASON M. GALLINA, M.D.,**
**JASON M. GALLINA, M.D., PC,**
**KOLB RADIOLOGY PC, and,**
**THOMAS KOLB, M.D.,**
(*"Medical Provider Defendants"*)

**Defendants.**

---

## FIRST AMENDED COMPLAINT

---

# Table of Contents

I.      JURISDICTION AND VENUE ................................................................. 4

II.     PARTIES ............................................................................................. 4

    A. Plaintiff ........................................................................................ 4

    B. Defendants ................................................................................... 4

    i.   Legal Service Defendants ......................................................... 4

    ii.  Runner/Support Defendants ...................................................... 6

    iii. Funding Defendants ………………………………………………13

    iv. Medical Provider Defendants ................................................... 17

III.    BACKGROUND, CONTEXT, AND THE FRAUD SCHEME .............................. 26

IV.    THE FRAUD SCHEME ENTERPRISE .................................................... 78

V.     FURTHER PATTERN OF RACKETEERING
     ACTIVITY HAVING DIRECTLY HARMED PLAINTIFF ..................................... 84

VI.    PLAINTIFFS' JUSTIFIABLE RELIANCE ............................................ 139

VII.   DAMAGES ....................................................................................... 140

VIII.  CAUSES OF ACTION .................................................................... 142

IX.    JURY TRIAL DEMAND .................................................................. 166

Plaintiff UNION MUTUAL FIRE INSURANCE COMPANY (hereinafter referred to as "Union") by and through their attorneys THE WILLIS LAW GROUP, PLLC, allege as follows:

## I.     JURISDICTION AND VENUE

1.     This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

## II.    PARTIES

### A.     <u>Plaintiff</u>

3.     UNION MUTUAL FIRE INSURANCE COMPANY ("Plaintiff") is an insurance company duly organized and existing under the laws of the State of Vermont and maintains its office in that state. Plaintiff, along with many, many others, is the victim of a wide-ranging, ongoing, and fraudulent scheme (the "Fraud Scheme") conducted by the Defendants and others.

### B.     <u>Defendants</u>

#### i.   <u>Legal Service Defendants</u>

4.     At all times relevant herein, Defendant SUBIN ASSOCIATES, LLP is/was a limited liability partnership organized and existing under the laws of the State of New York.

5.     At all times relevant herein, Defendant SUBIN & ASSOCIATES, LLC is/was a limited liability company organized and existing under the laws of the State of New York.

6.      At all times relevant herein, Defendant SUBIN, LLP is/was a limited liability partnership organized and existing under the laws of the State of New York.

7.      At all times relevant herein, Defendant ERIC SUBIN, PLLC is/was a professional limited liability company organized and existing under the laws of the State of New York (collectively with SUBIN ASSOCIATES, LLP, SUBIN & ASSOCIATES, LLC, and SUBIN, LLP, "Subin Firm").

8.      At all times relevant herein, upon information and belief, Defendant HERBERT S. SUBIN ("Herbert Subin") resides in and is/was a citizen of the State of New York. He is also the managing partner of Subin Firm.  At all times relevant, Herbert Subin is licensed or otherwise authorized to practice law in the State of New York.

9.      At all times relevant herein, upon information and belief, Defendant ERIC SUBIN ("Eric Subin") resides in and is/was a citizen of the State of North Carolina. He is also a senior partner and owner of Subin Firm and is Herbert Subin's nephew. At all times relevant, Eric Subin is licensed or otherwise authorized to practice law in the State of New York.

10.     At all times relevant herein, upon information and belief, Defendant ARNOLD BAUM ("Baum") resides in and is/was a citizen of the State of New York. He is also the COO and General Counsel of Subin Firm.  At all times relevant, Baum is licensed or otherwise authorized to practice law in the State of New York.

11.     Subin Firm, Herbert Subin, Eric Subin, and Baum are collectively referred to herein as the "Subin Defendants."

12.     At all times relevant herein, Defendant CLAY M. EVALL, ESQ. P.C. ("Evall Firm") is/was a professional corporation organized and existing under the laws of the State of New York.

13.     At all times relevant herein, upon information and belief, Defendant CLAY M. EVALL ("Evall"; together with Evall Firm, the "Evall Defendants") resides in and is/was a citizen of the State of New York, and is the owner of Evall Firm. At all times relevant, Evall was licensed or otherwise authorized to practice law in the State of New York.

14.     At all times relevant herein, Defendant LAW OFFICES OF GARY S. PARK, P.C. ("Park Firm") is/was a professional corporation organized and existing under the laws of the State of New York.

15.     At all times relevant herein, upon information and belief, Defendant GARY PARK ("Park"; together with Park Firm, the "Park Defendants") resides in and is/was a citizen of the State of New York, and is the owner of Park Firm. At all times relevant, Gary Park was licensed or otherwise authorized to practice law in the State of New York.

16.     Subin Defendants, Evall Defendants, and Park Defendants. are collectively referred to as the "Legal Service Defendants."

ii.  <u>Runner/Support Defendants</u>

17.     Defendants JOHN DOE NOS. 1-25 are persons of unknown citizenship who, at all times relevant herein, participated in the fraudulent scheme described below by recruiting potential claimants into staging, manufacturing and/or otherwise perpetuating fake trip and fall accidents at various sites throughout New York ("Runners").

18.     Upon information and belief, Defendant J. HERNANDEZ ASSOCIATES JR., INC. ("Hernandez Associates") is and was a corporation organized and existing under the laws of the State of New York.

19.     Upon information and belief, Defendant JOSE HERNANDEZ ("Hernandez") is a resident of the State of New Jersey. At all times relevant herein, Hernandez was a "Manager" at Subin Firm (where he has worked since at least 2014), as well as the owner of Hernandez

Associates, which is also located in the 14th Floor Support Services Office. At least two of Hernandez's direct relatives have worked or do work for Subin. Mr. Hernandez also performs work for the Evall Firm.

20.     Defendant WALL STREET TRANSPORTATION SERVICES, INC. ("WS Transportation") is a corporation organized and existing under the laws of the State of New York.

21.     Defendant WALL STREET INVESTIGATIONS INC. ("WS Investigations") is a corporation organized and existing under the laws of the State of New York.

22.     Defendant WALL STREET CLERICAL AND OFFICE SERVICES INC. ("WS Clerical") is a corporation organized and existing under the laws of the State of New York.

23.     Defendant WALL STREET CALENDAR SERVICES INC. ("WS Calendar Services") is a corporation organized and existing under the laws of the State of New York.

24.     Defendant WALK STREET INVESTIGATIONS INC. ("Walk Street") is a corporation organized and existing under the laws of the State of New York.

25.     Hernandez is the on-paper owner and/or operator for (in addition to Hernandez Associates) WS Transportation, WS Investigations, WS Clerical, WS Calendar Services, and Walk Street, and each also has a registered address in the 14th Floor Support Services Office at Subin Firm.

26.     Defendant WALL STREET CHECK CASHING INC. ("WS Check Cashing") is a corporation organized and existing under the laws of the State of New York, also located in the 14th Floor Support Services Office at Subin Firm.

27.     WS Check Cashing, upon information and belief, the source of such information and belief being a verification check through the NMLS system utilized by the New York State Department of Financial Services, WS Check Cashing does not hold a valid check cashing license,

as is required to own and operate such a business under New York Banking Law Art. 9-A and Superintendent's Regulations Parts 400, 416, 417 and 300.

28.     Defendant MEDICAL EXAM GUARDIANS INC. ("Medical Guardians") is and was a corporation organized and existing under the laws of the State of New York. Upon information and belief, at all times relevant herein, Medical Guardians business was to send purported "guardians" with claimants to attend independent medical examinations and provide independent reports. The registered address for Medical Guardians is Hernandez's old Corona, NY apartment, where, *inter alia*, Hernandez Associates has previously listed its operating location.

29.     Upon Information and belief, Defendant GERALDINE DELEON ("DeLeon") is and was at all times relevant herein a resident of the State of New York. DeLeon has provided services for Medical Guardians – for a Subin-represented Claimant – while simultaneously working as Subin Firm's Operations Lead:



30.     Upon information and belief, Defendant LUIS F. DELEON, is and was a resident of the State of New York, provided notary services for both Subin Firm and Evall Firm, and has also attested to being an "investigator" for the Subin Firm.

31.     Upon information and belief, Defendant JORGE ARTURO GONZALEZ LUPI a/k/a JORGE GONZALEZ-LUPI a/k/a Jorge Lupi ("Lupi") is and was at all times relevant herein a resident of the State of New York.

32.     Defendant J & D INVESTIGATION SERVICES CORP. ("JD Services") is and was a corporation organized and existing under the laws of the State of New York. At all relevant times, upon information and belief, Lupi operated, controlled, and was majority owner of JD Services.

33.     Defendant AMEDICO LEGAL, LLC ("Amedico") is and was a limited liability company organized and existing under the laws of the State of New York. At all relevant times, upon information and belief, Lupi operated, controlled, and was majority owner of Amedico.

34.     Defendant AMEDICOLEGAL FUNDING, LLC ("Amedico Funding") is and was a limited liability company organized and existing under the laws of the State of New York. At all relevant times, upon information and belief, Lupi operated, controlled, and was majority owner of Amedico Funding.

35.     Defendant AMEDICO LEGAL NETWORK LLC ("Amedico Network") is and was a limited liability company organized and existing under the laws of the State of Delaware. At all relevant times, upon information and belief, Lupi operated, controlled, and was majority owner of Amedico Network.

36.     Defendant AMEDICO HOLDCO, LLC ("Amedico Holdco") is and was a limited liability company organized and existing under the laws of the State of Delaware. At all relevant

times, upon information and belief, Lupi operated, controlled, and was majority owner of Amedico Holdco.

37.     Upon Information and belief, Defendant MARYSELA K. SALINAS ("Salinas") and was a resident of the State of New York. Salinas was herself a trip and fall claimant under Queens Index #: 704784/2018, brought by Law Office of Gary Park and transferred to Subin Firm.

38.     Defendant M.K.S. CONSULTANTS, INC. d/b/a Latinos Legal Connections ("MKS"), is and was a corporation organized and existing under the laws of the State of New York. Upon information and belief, MKS was at all relevant times owned nominally by Salinas, and controlled/operated by Lupi.

39.     Defendant JUSTICIA INC. ("Justicia") is and was a corporation organized and existing under the laws of the State of New York. Justicia was incorporated in June 2023. Justicia's registered address is a condominium owned by Defendant Hernandez. Justicia is, upon information and belief, a joint venture between and amongst Lupi, Hernandez, and Subin Firm.

40.     Defendant SAHIWAL ASSOCIATES, INC. (NJ) is and was a corporation organized and existing under the laws of the State of New Jersey ("Sahiwal NJ").

41.     Defendant SAHIWAL ASSOCIATES, INC. (NY) is and was a separately incorporated corporation organized and existing under the laws of the State of New York ("Sahiwal NY") (collectively with Sahiwal NJ, "Sahiwal").

42.     Upon information and belief, Defendant TANVIR CHAUDHRY ("Chaudhry") is currently a resident of the State of New York, and was at all relevant times herein a resident of New Jersey and/or New York. Upon information and belief, Chaudhry is the owner and/or operator of Sahiwal NJ.



43.     Upon information and belief, Chaudhry is also the owner of a non-party entity called Top Law Capital Inc., corresponding with Subin's marketing materials as seen below – and is located in the neighboring building on Broadway. Top Law Capital Inc. has never filed a Uniform Commercial Code Financing statement ("UCC") required to perfect a secured interest.



44.     Sahiwal NY is registered to the Staten Island address of Defendant ELSIE REAL CIBBARELLI ("Cibbarelli"), a New York resident and Subin Firm's "Senior Client Relations Specialist," and was, upon information and belief, incorporated by Cibbarelli's husband.



45.     Defendant TRI-STATE MEDICAL LIAISON SERVICES, LLC ("Tri-State"), is a limited liability company organized and existing under the laws of the State of New York. Upon information and belief, Tri-State is also owned and/or operated by Chaudhry. The registered address of Tri-State was owned at all relevant times by another Subin claimant.



46.     Defendants XYZ SUPPORT CORPORATION NOS. 1-25 (together with Hernandez, Hernandez Associates, Medical Guardians, DeLeon, WS Transportation, WS Investigations, WS Clerical, WS Calendar Services, and Walk Street, Lupi, JD Services, Amedico, Amedico Network, Amedico Holdco, and Justicia, collectively, the "Support Defendants") are individuals and business entities of unknown organization that participated in the Fraud Scheme by recruiting and managing Runner Defendants, facilitating Claimants' course through the Fraud Scheme with Funding Defendants and Medical Defendants, and directly and/or indirectly diverting funds from recoveries back to the Legal Service Defendants through recoupment of expenses not paid, paid in form and function to themselves, or diverted to compensate various Defendants for their role in the Fraud Scheme.

iii.     <u>Funding Defendants</u>

47.     Defendant PEGASUS LEGAL CAPITAL, LLC is and was at all relevant times herein a limited liability company organized and existing under the laws of the State of Delaware.

48.     Defendant PEGASUS FUND LLC (collectively with PEGASUS LEGAL CAPITAL, LLC, "Pegasus") is and was at all relevant times herein a limited liability company organized and existing under the laws of the State of Delaware.

49.     Upon information and belief, Pegasus is also the successor to, *inter alia*, Pegasus Legal Funding LLC, Pegasus Legal Funding II LLC, and Fund Pegasus LLC. Upon information and belief, Pegasus also does business through "Fast Case Funding LLC," and operates a medical receivables funding arm through "Airmed Capital, LLC."

50.     Defendant PSC LIAISONS, LLC ("PSC") is and was a limited liability company organized and existing under the laws of the State of New York.

51.     Upon information and belief, Defendant GREGORY ELEFTERAKIS ("Elefterakis"), is and was at all relevant times a resident of the State of New York. Upon information and belief, Elefterakis, a disbarred attorney, was at all relevant times the owner and/or operator of PSC.



52.     Defendant CORONA 55 FUNDS, INC. ("Corona Funds") is a corporation organized and existing under the laws of the State of New York. Hernandez is the on-paper President and CEO.

53.     Defendant CORONA 55 INC. ("Corona 55," together with Corona Funds, "Corona") is a corporation organized and existing under the laws of the State of New York. Corona 55 has a registered address of Hernandez's Corona, NY apartment (alongside Medical Guardians).

54.     Defendant WALL STREET CASE ADVANCES INC. ("WS Advances") is a corporation organized and existing under the laws of the State of New York. WS Case Advances has an identical registered address as Corona Funds, and Hernandez is once again the on-paper President and CEO. WS Case Advances also has a listed operating location at Hernandez's Corona,

NY apartment. Despite these businesses being active, WS Advances and Corona have never filed UCC statements as required, making any advances virtually impossible to identify.

55.     Regardless of identified location for WS Advances and the other "Wall Street" and Corona entities, **the true place of business for WS Advances and Corona is right there in the 14th Floor Support Services Office of Subin Firm, alongside Hernandez Associates and Evall Firm.**





56.     Defendant CASE CASH FUNDING, LLC is a limited liability company organized and existing under the laws of the State of New York.

57.     CASE CASH GP, LLC (collectively with CASE CASH FUNDING, LLC, "Case Cash") is a limited liability company organized and existing under the laws of the State of New York. Case Cash is owned by Elefterakis. Upon information and belief, advances under the "GP" moniker were in fact underwritten and funded by non-party Golden Pear Funding, with Case Cash operating as the originator and servicer.

58.     Defendant NEAL MAGNUS ("Magnus") is and was at all relevant times a resident of the State of New Jersey.

59.     Defendant BEST CASE ORIGINATIONS, LLC ("Best Case Originations") is a limited liability company organized and existing under the laws of the State of New York.

60.     Defendant BEST CASE ORIGINATIONS D, LLC ("Best Case D") is a limited liability company organized and existing under the laws of the State of Delaware.

61.     Defendant RL SPV, LLC ("RL SPV") is a limited liability company organized and existing under the laws of the State of Delaware.

62.     Upon information and belief, at all relevant times herein, Magnus owned, operated, and/or controlled Best Case Originations, Best Case D, and RL SPV, as well as other "Best Case" family companies.

63.     Defendants XYZ FUNDING CORPORATION NOS. 1-25 (together with Saliwal, Chaudhry, Corona Funds, Corona 55, WS Case Advances, Case Cash, WS Check Cashing, Best Case Originations, Best Case D, and RL SPV, LLC collectively, the "Funding Defendants") are business entities of unknown organization that participated in the fraudulent scheme described below by providing funds directly and/or indirectly to the Legal Service Defendants, the Runner and Support Defendants, the Claimants (defined below) and/or the Medical Provider Defendants.

iv. <u>Medical Provider Defendants</u>

64.     Defendant BESTCARE PHYSICAL THERAPY AND CHIROPRACTIC, PC ("Bestcare PT") is, at all times relevant herein, a professional corporation organized and existing under the laws of the State of New York.

65.     Defendant MAXIM ORTHOPAEDICS PLLC s/d/b/a MAXIMUM ORTHOPEDICS s/d/b/a WORKERSCOMPENSATIONDRS.COM ("Maxim Ortho") is, at all times relevant herein, a professional limited liability company organized and existing under the laws of the State of New York.

66.     Defendant MAXIM TYORKIN, M.D. ("Tyorkin," and together with Maxim Ortho, the "Maxim Defendants") is, at all times relevant herein, a licensed physician practicing in the State of New York.

67.     Defendant ALL BORO MEDICAL REHABILITATION PLLC ("All Boro") is, at all times relevant herein, a professional limited liability company organized and existing under the laws of the State of New York. All Boro operates as one of the transient clinic providers at Maxim Ortho's locations.

68.     Defendant KEVIN H. WEINER, M.D. ("Weiner") is, at all times relevant herein, a licensed physician practicing in the State of New York – albeit under a stayed suspension and under strict and extensive limitations.

69.     On February 27, 2023, the Department of Health charged Weiner with twenty (20) violations constituting professional misconduct. In a scathing 73-page decision, the hearing committee **sustained, *inter alia,* all five (5) charges of ordering unwarranted tests and treatment**, issued a two-year stayed suspension, permanently precluded Weiner from prescribing any controlled substances, **permanently precluded him from providing any surgical,**

**interventional, or invasive treatments expressly including injections**, and made the following relevant factual findings:

considerable lack of information in each patient's records. For Patients A-E, the Respondent failed to appropriately evaluate the patient; failed to perform a comprehensive physical examination; failed to render a diagnosis before instituting treatment; failed to develop, implement, and revise a personalized treatment plan; failed to follow-up on prior complaints, recommended treatments, and injections and other procedures performed; and failed to maintain a record for each patient that accurately reflects the care and treatment rendered.

The hearing record is replete with instances of the Respondent's failure to exercise the care that would be exercised by a reasonably prudent physician.

No explanation was found in the Respondent's records as to why therapy or any other more conservative treatment was inadequate. Patient E was placed at unnecessary and unjustifiable risk. The Respondent's actions, as well as his testimony, reflected a complete unawareness of the safety issues he created.

information, the Respondent's treatment for those patients was not warranted. With respect to Patient E, the Respondent failed to properly evaluate the patient and exhaust all medical spinal treatments before recommending and performing the discogram and endoscopic microdiscectomy. The discogram and endoscopic microdiscectomy were therefore not warranted by the patient's condition. Accordingly, the Hearing Committee sustains specifications eleven through fifteen.

70.     On August 31, 2023, the Workers' Compensation Board suspended Weiner's authorization to treat Workers' Compensation patients until further notice.

71.     Regardless of being prohibited by the Department of Health from performing injections and other invasive procedures, and regardless of being suspended from Workers' Comp, Weiner continues to market himself as "specializing" in Workers' Comp, with injections being his primary marketed treatment, including in advertisements created in 2025.





72.     Weiner challenged the Workers' Comp decision to suspend his authorization under Index No. 85056/2023; <u>Kevin Weiner MD v. New York State Workers' Compensation Board</u>,

Richmond County Supreme Court, State of New York. The Court denied the challenge and upheld the suspension.

73.     Defendant FELIX KARAFIN, M.D. ("Karafin," and together with All Boro and Weiner, the "All Boro Defendants") is, at all times relevant herein, a licensed physician practicing in the State of New York.

74.     Weiner and Karafin are employed by, and/or otherwise held out as the treatment providers for, All Boro.

75.     Defendant RJR MEDICAL P.C. ("RJR Medical") is, at all times relevant herein, a professional corporation organized and existing under the laws of the State of New York. RJR is another transient provider operating within the Maxim clinics.

76.     Defendant URBAN HEIGHTS MEDICAL, PC ("Urban Heights") is, at all times relevant herein, a professional corporation organized and existing under the laws of the State of New York. Urban Heights is another transient provider operating within the Maxim clinics.

77.     Defendant ALBERT J. CIANCIMINO, M.D. ("Ciancimino," and with RJR and Urban Heights, the "RJR/UH Defendants") is, at all times relevant herein, a licensed physician practicing in the State of New York. Ciancimino is employed by, and/or otherwise held out to be the provider for, RJR and UH. Notably, Ciancimino is an 82-year-old gastroenterologist.

78.     Bestcare PT Defendants, Maxim Defendants, All Boro Defendants, and RJR/UH Defendants are collectively the "Clinic Defendants."

79.     Defendant NY ORTHOPEDICS, P.C. s/d/b/a SPINECARENYC ("Gerling PC") is and was at all times relevant herein a professional corporation organized and existing under the laws of the State of New York.

80. Defendant MICHAEL GERLING, M.D. ("Gerling"; with Gerling MD, the "Gerling Defendants") is and was, at all times relevant herein, a licensed physician practicing in the States of New York and New Jersey. At all relevant times herein, Gerling has been the owner, operator, officer, director and/or employee of Gerling PC.

81. Gerling was featured in recent news articles surrounding his decision to perform lumbar and cervical fusions in a 23-year old, paid for by litigation funding, who was referred to him and represented by Subin. Gerling was a RICO Defendant under similar circumstances in a matter brought by Geico, which, upon information and belief, he settled for 2.5 million.

82. Notably, in a precursor case of *Geico v. Mayzenberg*, Geico established *as a matter of law* that Mayzenberg funneled money through Igor Dovman-controlled shell "marketing" companies who were running an illegal patient-brokering scheme and providing kickbacks. Discovery revealed funds being similarly funneled through both Dovman entities as well as Walter Gran entities to Gerling from a law firm whose clients Gerling was treating. Geico then sued Gerling directly.

83. **Gerling having, upon information and belief, settled that case for $2.5m dollars, does not remove his name or his businesses from these checks issued from parties found to have conspired to commit fraud as a matter of law, from the shell companies used to perpetuate such fraud.**









84. Hon. Justice Esposito, sitting in the Supreme Court for the County of Queens, State of New York, recently stated on the record in ruling on the scope of cross-examination of Gerling:

> I am going to be very hard on him because I am sick and tired of certain medical people who come in here and who with unclean hands, mind you, and try to pull off what he is trying to do here.

> I'm insulted by it. He is insulted by something; I am insulted by Dr. Gerling. And we'll see how it goes. I'm going to be very fair to all of you, but I am not going to let him off the hook because he doesn't deserve to be let off the hook and to be

> presented to this jury like he's some kind of an expert medical person, because to me he is bordering on criminality.

> MR. KIM: But the probative value of that has nothing to do with this case, your Honor. It's prejudicial to my client's case.
>
> THE COURT: Maybe she should have gone to a different doctor.
>
> Who sent her to Dr. Gerling, you?
>
> MR. KIM: Her physician did, your Honor.
>
> THE COURT: They are all in cahoots, and put that on the record. That's my ruling.

85.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho" or "NY S&J" when utilizing the alias) is a professional limited liability company organized and existing under the laws of the State of New York.

86. Defendant KENNETH MCCULLOCH-OTERO, M.D. ("McCulloch" and together with McCulloch Ortho, the "McCulloch Defendants") is a licensed physician practicing in the State of New York. At all relevant times herein, McCulloch has been an owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

87. Defendant SANFORD R. WERT, M.D., PC ("Wert PC") is a professional corporation organized and existing under the laws of the State of New York.

88. SANFORD R. WERT, M.D. ("Wert," collectively with Wert PC, the "Wert Defendants") is a licensed physician practicing in the State of New York. At all relevant times herein, Wert has been an owner, operator, officer, director and/or employee of Wert PC. Wert has previously testified in open court that he has performed surgery on patients who he admittedly did not believe to be surgical candidates:

```
    Q    Now, would it be fair to say when we look at the
indications of surgery on September 28, 2016, Ms. Han was not a
candidate for surgery to her left knee?
    A    Correct.
```

```
    Q    And it would be fair to say that you did not recommend
surgery on that date?
    A    Correct.
```

```
    Q    And at some point in time she had surgery, fair to say?
    A    Yes.
```

> Q    She did not come in for further evaluation?
>
> A    No.
>
> Q    So the Plaintiff on September 28, 2016 was not a
> candidate for surgery, and then you performed surgery without
> even a further evaluation, correct?
>
> A    Correct.

Han v. Spetsieris, 707898/17, Trial Transcript October 17, 2019.

89.    JASON M. GALLINA, M.D., PC ("Gallina PC") is a professional corporation organized and existing under the laws of the State of New York.

90.    JASON M. GALLINA, M.D. ("Gallina," collectively with Gallina PC, the "Gallina Defendants") is a licensed physician practicing in the State of New York. At all relevant times herein, Gallina has been an owner, operator, officer, director and/or employee of Gallina PC.

91.    The Gerling Defendants, McCulloch Defendants, Wert Defendants, and Gallina Defendants are collectively referred to as the "Surgical Defendants."

92.    Defendant KOLB RADIOLOGY PC ("Kolb Radiology") is, at all times relevant herein, a professional corporation organized and existing under the laws of the State of New York.

93.    Defendant THOMAS KOLB, M.D. ("Kolb," and together with Kolb Radiology, the "Kolb Defendants") is and was, at all times relevant herein, a licensed physician practicing in the State of New York. At all relevant times herein, Kolb has been the owner, operator, officer, director and/or employee of Kolb Radiology. Kolb Radiology is the MRI provider of choice for those that wish to conjure an injury into existence.

94.    The Clinic Defendants, Surgical Defendants, and Kolb Radiology are collectively referred to herein as the "Medical Provider Defendants."

95.     The Legal Service Defendants, the Runner/Support Defendants, the Funding Defendants, and the Medical Provider Defendants are collectively referred to herein as "Defendants."

## III.     BACKGROUND, CONTEXT, AND THE FRAUD SCHEME

96.     The Fraud Scheme set forth in this Complaint is not new. At its core, it is the same tired scheme: stage a fall (or just make it up), overtreat, and sue.

97.     What is new is the scope, breadth, and overall willingness to push this scheme as far as it will stretch – and then the willingness to find ways to stretch it further. As discussed *infra*, we are now at a point where one can directly derive profit from this Fraud Scheme from an E-trade account.

98.     What's also new is that no longer does anyone involved in the scheme need to wait until the individual suits settle in order receive proceeds from the fraud scheme.

99.     As in any rendition of this scheme, the claimants themselves are often impoverished immigrants, drug addicts, homeless, and otherwise those who have difficulty seeing another path with not just a promised large sum down the line if they play along, but access to money, otherwise unobtainable, within *hours*.

100.     Litigation funding is used to incentivize claimant cooperation with the Fraud Scheme *via* direct payments, including installments directly contingent on them going through with needless surgery; a *quid pro quo* by any other name. The return amount on the capital outlay is at levels that would otherwise be considered usurious, and the more money laid out, the more money is made by the Funding Defendants.

101.     Portfolio and firm funding allows the law firms, including Subin Firm, to receive funding secured by the value of their receivables; *i.e.*, their anticipated fees. The ability to front-load revenue based on projected claimant settlements gives a two-tiered incentive to those firms

seeking to capitalize at all costs – a) get more claimants and b) raise their projected settlement value.

102.    Receivable funding allows the Medical Provider Defendants to collateralize their outstanding liens, in addition to upfront payments by Funding Defendants. Since there is no oversight on fees as there is in Workers' Comp on No Fault, they can bill what they wish. Since there is no downside risk, there is little concern over whether a surgery is in fact causally related to an accident.

103.    The only ceiling for the Medical Defendants, then, is the number of patients, amount of treatment, and number of surgeries you can fit in a day. With the only limitation on income being getting the facility stocked full of patients, this incentivizes doctors to act in the manner which they are aware their referral source wants – here, finding injuries that don't exist, overtreating as much as possible, and performing needless surgery.

104.    Even the funders no longer need to wait, by packaging and cross-collateralizing the advances into securities in various forms, including debt instruments to registered mutual funds, secured notes, and pooled investment funds. Pegasus has lines of credit with multi-continent private equity firm Sandton Capital Partners and securitizes pools of advances into notes sold to investors. Case Cash does the same as junior venture partner to non-party Golden Pear Funding.

105.    Massive levels of infrastructure have been laid, and every aspect of the scheme - from the recruitment efforts, to the treatment protocols and number of doctors willing to compromise their reputation, to the funding entities not just making outrageously usurious levels of returns, but developing enough inventory to securitize and cross-collateralize assets to front load their returns and bring in outside capital – is operating on a scale never before seen.

106. From at least 2012 through to the present, Defendants have been engaged in this evolving fraudulent scheme (the "Fraud Scheme"), as refined and expanded upon over time.

107. Defendants, together with others known and unknown, for their financial benefit, have and continue to defraud Plaintiff and others. Defendants have collected, falsified, manufactured, and/or otherwise prepared fraudulent documentation; recruited, incentivized, and coached desperate claimants to lie about accidents and purported injuries; orchestrated knowingly unnecessary and unjustified surgeries; all with the goal of enriching the criminal enterprise, expanding it, furthering it, insulating it, and legitimizing it.

108. Each of the Defendants was aware of the scheme and knowingly played their roles, enriching themselves in the process at the expense of the physical well-being of some of society's most vulnerable, and to the direct financial detriment of Plaintiff and others. Defendants, in the course of this scheme, have polluted the legal and medical professions, and perverted the Courthouses of the State of New York away from their truth-finding function and into their own personal profit centers.

109. The Fraud Scheme has infiltrated legitimate institutions, and the Defendants rob Plaintiff and others by use *of the State Court system itself*. It is thus worth noting, as the Second Circuit did in <u>State Farm v. Triborough Medical</u>, *et. al.*, that "RICO's legislative history shows that Congress was nonetheless concerned about state courts being used to further a violation of RICO and accordingly contemplated that state-court proceedings could be enjoined to 'prevent and restrain violations' of RICO."

110. At the center of this Fraud Scheme, and the Enterprise machinery, is the Subin Firm.

111. Historically, there has never been a comparator to the Legal Defendants herein. Lawyers Marc Elefant and George Constantine, along with medical providers, runners, and others,

were convicted for their roles in a $31 million dollar trip-and-fall fraud scheme (the "Kalkanis Scheme") between 2013 and 2018; the Department of Justice ("DOJ") described the fraud as "massive."  In 2012, the DOJ prosecuted 36 individuals in connection with an alleged $275 million no-fault scheme.

112.    The Subin Firm? Over $3 Billion Recovered™.

### *Relevant History and Predicate Acts*

#### a)  *Runners Funding and Funding Runners*

113.    In 2012, Subin undertook representation of a Claimant named Toribio De Jesus.

114.    Much later, Mr. De Jesus retained legitimate counsel, and laid out the following sworn allegations (in relevant part), with supporting documentation:

> TORIBIO DEJESUS, being duly sworn, deposes and says:
>
> I am the plaintiff in the within action.

….

> Instead, on December 31, 2012, I was brought to Subin & Associates by a person I knew by the name of Jorge, who recommended them to represent me in connection with the accident.  After I signed a retainer agreement with Subin, Jorge told me that he received several thousand dollars from Subin for bringing them the case, which he promised to share but never did.  I signed with

Subin because I was not working and I needed the money to live on. While I was in Subin's office, I met with individuals who identified themselves as Herb Subin and Eric Subin. I was told by them that in order to accept my case, I would have to sign a separate agreement (Exhibit ""), which was presented to me by and individual who identified himself as "Castillo". The agreement was in both English and Spanish, and called for me to pay $100,000 out of any money received from my case.

Next, Subin's office introduced me to a legal funding company who they said would lend me money against my case. Over the course of more than 2 years, I signed numerous agreements, first with one company and then with another. Sometimes, I received money from the companies which I needed to live, since I was unable to work, and other times, I was told by Subin that they needed me sign agreements to take out money to pay for things in connection with my case, although they never told me exactly what the money was for. Each time, I did what they said and signed whatever they told me to sign because I trusted them. I didn't know or really consider that I was borrowing the money at such a high interest rate because Subin always assured me that my case was worth at least $4 million dollars. I never expected though that I would end up owing over $5 million dollars to the companies.

Mr. Seskin asked me about my medical treatment and told me that the records showed that payments were by the legal funding companies to people and businesses I had never heard of or received treatment from. For instance, I saw and was told that $30,000.00 was paid at Subin's direction to PSC Liaison Services, LLC, for Physical Therapy and Pain Management as needed for 1 year. I have never heard of PSC Liaison Services, LLC, and I never received physical therapy or pain management from them "as needed" for 1 year. Certainly, if I had known that I had unlimited physical therapy and pain management for 1 year, I would have used it every day. I also learned that $25,000 was paid to Tri-State Medical Liaison Services. Again, I have never heard of this service, and I have never received any medical treatment from it.

31 diciembre 2012

Subin Associates, LLC
150 Broadway 23 pisos
Nueva York, NY 10038

Esto es para certificar que yo Toribio De Jesus estoy en deuda con Sahiwal Asociados, Inc por los servicios prestados por la suma de $ 100.000

Estoy de acuerdo en que Sahiwal Associates Inc tiene derecho de retención en contra de la parte del producto de mi materia de lesiones personales por el monto total de 100.000 dólares por los servicios prestados a la demanda.

Saludos cordiales

Toribio De Jesus

Sworn to before me this
31ᵗ day of Dec, 2012

Virginia T Delgado

VIRGINIA I. DELGADO
Notary Public, State of New York
No. 01DE6133092
Qualified in Queens County
Commission Expires September 6, 20 13

Translated: "This is to certify that I, Toribio De Jesus, am indebted to Sahiwal Associates, Inc. for services rendered in the amount of $100,000. I agree that Sahiwal Associates Inc. has the right to a lien against the portion of proceeds from my personal injury matter in the total amount of $100,000 for services rendered in the lawsuit."

**Exhibit 1.**

115.    Upon information and belief, the "Castillo" referenced in Mr. De Jesus's affidavit is Jaime Castillo, a Subin employee since 1992. The referenced "Jorge" is upon information and belief Jorge Lupi, a known runner, acting on behalf of Subin and, at that point in time, Defendants Chaudhry and Sahiwal. The funding company associated was identified in the relevant contract as Case Cash Funding, and in the payoff letters as Case Cash GP. Notably, the funding agreement had a 15k installment contingent on undergoing surgery.

116.    Case Cash, upon the attorney's repeated inquiries, notably dropped the satisfaction amount from $5,842,982.85 down to $135,000. Emails from Case Cash were proffered confirming the payments to PSC and Tri-State (and 85k for surgery with Defendant Gerling), including an image of the check to PSC:



CASECASH GP, LLC

TEL (866) 703-CASH (2274)
FAX (718) 237-4412

*Law Office of Scott H. Seskin via email: ss@seskinlaw.com*

April 23, 2021

**RE:    TORIBIO DE JESUS**
**The cause of action arising from the injuries sustained in the accident which occurred on or about**
**November 13, 2012, involving TORIBIO DE JESUS.**

To Whom It May Concern:

Pursuant to your reduction request, please find the new payoff figures for the above referenced client.

If your check in the amount of **$135,000.00** is received by **May 23, 2021,** the above-captioned lien and our security interest will be released and will be considered paid in full. This is a reduction from the original amount owed of **$5,842,982.86**. However, if the check is not received by this date, a new payoff figure will apply and you must call our office for that amount.



**RE: Toribio Dejesus**

Denis Zambrano <dzambrano@casecashfunding.com>
Thu 11/5/2020 9:04 AM

**To:** Scott Seskin <ss@SESKINLAW.COM>
**Cc:** Kathy Nieves <knieves@casecashfunding.com>

📎 1 attachments (19 KB)
Invoice_for_torio_De_Jesus.docx;

Good Morning,

This is what we have on file:
LMC Physician Services: $42,750.00
Jacob Katanov - $3,000.00
Tri-State Medical Liaison Services - $25,000.00
University Physicians of Brooklyn - $1,000.00
Lutheran Medical Center - $13,250.00

Attached is breakdown we received from previous attorney

PSC Liaison Services - $30,000.00 – I see a note in file that attorney advised of this verbally

**Exhibit 2.**

117. Perhaps most importantly, a spreadsheet was provided of outstanding Case Cash advances regarding open Subin files (**Exhibit 3**), demonstrating Mr. De Jesus was far from alone in having tens of thousands of fraudulently represented and/or undisclosed payments made to PSC and to Tri-State. On at least twelve (12) separate occasions, Case Cash has made falsely characterized and direct payments, on ledgers attributable to claimant accounts, of amounts ranging between $5,000 and $33,000 to PSC (Elefterakis) and Tri-State (Chaudhry). Case Cash then applied otherwise-usurious interest rates to these amounts, which were ultimately reimbursed out of settlements – *i.e.*, the amounts were ultimately paid by the settling party (and deducted, with interest from claimants' recoveries) for amounts that were effectively "disappeared into" accounts (in effect, slush funds) controlled by Elefterakis and Chaudhry:

    a.   Manzoor Ahmad, 150871/2013 (New York County)

          1.   $30,500 to PSC Liaisons

    b.   Eduard Alabayev

          1.   $20,500 to PSC Liaisons

    c.   Carlos Balcazar, 151191/2014 (New York County)

          1.   $25,000 to Tri-State

    d.   Luisa Eisenbach 152999/2013 (NY County)

          1.   $25k to Tri-State

    e.   Yomaldbi Jimenez, 30455/2013 (NY)

          1.   $20k to Tri-State

    f.   Francisco Peralta, 300911/2013 (Bronx)***

          1.   $30k to Tri-State

          2.   $30k to PSC Liaisons

g.  Jose Rivas

    1.  25k to Tri-State

h.  Balvinder Singh

    1.  25k to Tr-State

118.  Peralta's matter (sub-[f], above) was settled in 2018 and warrants review; and not just for the fact that Gerling asserted a $67k "lien" <u>despite having already been paid by Case Cash</u>; not just because Case Cash made a 20k installment <u>contingent on undergoing surgery</u>; and not just for the fact Plaintiff's name was in fact Daniel Antonio Peralta Jimenez.

119.  The OCA closing statement filed in the Peralta matter reflects the following liens and expenses deducted, where Peralta ultimately received less than 27% of the recovery:



12. Itemized statement of payments made for hospital, medical care or treatment, liens, assignments, claims and expenses on behalf of the client which have been charged against the client's share of the recovery, together with the name, address, amount and reason for each payment. Wall Street Case Advance Inc., 524 E. 20th Street, Suite #4, New York, NY 10009, funding loan $52,785.00; Bainbridge Avenue MRI/Total Radiology, 701 Market Street, Suite 111, Box #172, St. Augustine, FL 32095, medical lien $500.00; Advanced Recovery Equipment and Supplies, 1501 Newkirk Avenue, Suite 585, Brooklyn, NY 11226, medical lien $806.64; Drew A. Stein, MD, 36 West 44th Street, Suite 401, New York, NY 10036, medical lien $6,525.00; Larry Shapiro PT, 520 West 218th Street, New York, NY 10034, medical lien $2,839.27; Spine Consult NJ PC (Dr. Gerling), 506 Fifth Avenue, Suite 2FF, Brooklyn, NY 11215, medical lien $67,969.00; Comprehensive MRI of New York PC, PO Box 127, Farmingdale, NY 11735, medical lien $1,365.00; All Boro Medical Rehabilitation, 369 East 149th Street, 3rd Floor, Bronx, New York 10455, medical lien $2,469.58; Complete Care, 19 East 37th Street, New York, NY 10016, medical lien $2,450.00; Precision Imaging of New York, 221 East 68th Street, New York, NY 10065, medical lien $3,600.00; Case Cash GP, LLC, Lockbox Services-205566, 2975 Regent Blvd., Irving, TX 75063, Funding Lien $561,000.00 - Grand Total $702,309.49.

Wall Street Case Advance Inc., funding loan $52,785.00

13. Itemized statement of the amounts of expenses and disbursements paid or agreed to be paid to others for expert testimony, investigative or other services properly chargeable to the recovery of damages together with the name, address and reason for each payment Bronx County Clerk, court fees $580.00; PM Investigation, investigation $15.00 Compressive MRI of New York, medical records $50.75; NAM, arbitration $1,260.00; Veritext, EBT Trans $461.50; IOD Inc., hospital records $23.97; Maya Risk Management Svcs, medical records $144.75; Federal Express $98.67; IME Watchdog, investigation $276.00; Misc. $324.30; City of New York, records $21.50; Andy Medina, investigation $1,300.00; Corporrate Transportation Group, Ltd., transportation $71.90; Stand Up MRI of Manhattan, PC, medical record $30.00; Southern 788 Medical PC, medical records $17.25; Alexander Poole, Inc., process service $54.00; Secretary of State, process service $120.00; J. Hernandez Associates PC., translation/transportation $909.00; Storage fee $110.00; E-Law, court service $33.00; CloudLex, case hosting $10.00; Xerox & postage $210.82 - Grand Total $6,122.41.

J. Hernandez Associates PC., translation/transportation $909.00

**Exhibit 4.**



120.     22 NYCRR 1200 Rule 1.8(e) and 1.8(i) mandate that "a lawyer shall not advance or guarantee financial assistance to the client," as well as "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client," respectively.

121.     Notably, Subin **did not oppose or contest the motion in De Jesus. Subin waived their case fees – a potential 6-figure amount - and walked away.**

122.     The 14th Floor Support Services Office contains numerous of the "Wall Street/Walk Street" entities, all headed by Hernandez, as well as Hernandez Associates and Evall Firm.

123.     Hernandez Associates has described itself in Court-filed documents as a company that exists to provide "legal support services to Subin." The registered phone number for Hernandez Associates connects to Subin Firm. Hernandez Associates has been documented to send employees out to meet with prospective claimants to sign intake forms (*i.e.*, formalized runners), and to purportedly bill Subin Firm (such expenses to be "recovered" by Subin at the conclusion of claimant cases) for a wide variety of purported expenses including transportation, translations, and "investigation."

124.     Upon information and belief, the Evall Firm functions as an extension of the Subin Firm to bypass conflicts and further operates as a "buffer" middleman firm when matters too conspicuously related to the subject scheme are brought, and/or to conceal referrals which are in fact diverted to runners and other non-attorneys.

125.     Further, there is no question as to the nature of what WS Advances purports to be, or that Evall Firm and Hernandez provide substantial assistance in its usage:



126.     Elefterakis, by making use of the wires to essentially transfer money from himself (as Case Cash) to himself (as PSC) under false pretenses, plainly committed wire fraud as defined under 18 U.S.C. § 1343, on at least:

        a.   June 5, 2014: $20,500 (Alabayev);

        b.   August 12, 2014: $30,000 (Peralta)

        c.   August 19, 2014: $30,500 (Ahmad); and,

        d.   August 28, 2014: $33,000 (De Jesus).

127.     In addition, in making and receiving knowingly misrepresented and fraudulent transfers, both Elefterakis (as Case Cash) and Chaudhry (as Tri-State) flatly committed wire fraud as defined under 18 U.S.C. § 1343, on at least:

a. October 1, 2013: $5,000 (Peralta);

b. January 7, 2014: $25,000 (Peralta);

c. January 15, 2014: $25,000 (De Jesus);

d. January 22, 2014: $25,000 (Eisenbach);

e. February 27, 2014: $20,000 (Jimenez);

f. May 6, 2014: $25,000 (Singh);

g. May 9, 2014: $25,000 (Balcazar); and,

h. May 15, 2014: $25,000 (Rivas).

128.    Defendant Best Case has similarly and fraudulently transferred money to Tri-State where Chaudhry was the listed referral source, with the payment similarly obfuscated in distributions to medical providers (and signed off on by Defendant H. Subin):



The undersigned hereby represents and warrants that he/she is authorized to execute this Acknowledgment and thereby to bind the Plaintiff's Counsel hereto.

[Plaintiff's Counsel]

By: _____  Print Name: **Herbert Subin**

129.   Each of the above transactions further made use of facilities of interstate commerce with intent to distribute the proceeds of unlawful activity and/or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, and the transfers manifested such intent, rendering each and every transfer an independent violation of 18 USC § 1952.

130.   Each of the above transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, each such transaction constituting an independent violation of 18 USC § 1956(a)(1)(B)(i).

131.   Each of these transactions so engaged in was in excess of $10,000 and were the proceeds of specified unlawful activity, in violation of 18 USC § 1957.

132.   As, upon information and belief, each transaction was made at the verbal instruction of the Subin Firm as noted by Case Cash employees, Subin Firm has conspired to, and in fact engaged in, each of the violations detailed above.

133.   In addition, in making and receiving knowingly a misrepresented and fraudulent transfer, Elefterakis, Case Cash, WS Advance, Hernandez, and Subin Firm committed an independent act of wire fraud as defined under 18 U.S.C. § 1343 on or about March 2, 2018, in disbursement of the Peralta matter.

134.     Upon information and belief, the money fraudulently diverted to Tri-State (and Sahiwal) were compensation for Chaudhry's role in the fraud scheme, which was managing runner networks on behalf of the enterprise, including Lupi, laundering proceeds to compensate the runners and claimants, generating willing claimants, arranging funding, and controlling the "set-up." Notably, evidence indicates Chaudhry has at times arranged both funding with Pegasus legal handling by Subin – as recently as 2023:



135. Upon information and belief, this practice continues to date, albeit to a lesser extent as Lupi's role has grown exponentially and the Support Defendants have gotten involved, and Chaudhry's involvement with Defendant Pegasus runs deeper still:



136.     Pegasus is similarly not shy about making additional funds contingent on surgery:

> We're committed to doing more than getting the money you need. Our team can also help connect you with affordable medical help and experienced legal representation. When you work with us, you gain coverage in every area. We can even revisit the details of your case after surgery to increase your cash advance amount based on the damage.

137.     After the Sahiwal allegations became part of public record, Chaudhry opened a new entity: Superior Trial & Litigation Consultants, Inc.[1]

138.     At least a portion of the money fraudulently diverted by Elefterakis to PSC was used in an effort to curry political favor, in furtherance of, and to insulate, the Fraud Scheme, including a contribution to the 2015 race for District Attorney, **directly from PSC's account** and **simultaneous with a contribution from Case Cash**:



139.     The August 26, 2015 transaction was undertaken by Elefterakis, Case Cash, and PSC with property used to conduct or facilitate specified unlawful activity, and to promote the carrying on of specified unlawful activity, in violation of 18 USC § 1956(a)(3)(A).

140.     Elefterakis has opened similar "Liaison" corporate entities, and upon information and belief, funded them in similar fashion, including Priority Liaison Services, LLC, Priority

---

[1] Which is a facially plausible match to Herbert Subin's "Trial Funding, Inc.," registered to his home address and remaining up-to-date and active since 2007 despite no public business presence or mention on a single public record.

Liaison Services of New York, LLC, Immediate Care Liaison Services LLC, and Immediate Care Liaison Services of NY LLC.







141.    These entities, along with various Case Cash and other entities under Elefterakis's ownership and control, have consistently made donations to sitting New York State Supreme Court Justices, often contemporaneously with one or both of his nephew's law firms and/or their principals:



| Lawyer/Firm | Contributor | Firm Name | $800-$2,499 | $2,500 or more | Date off the list |
|---|---|---|---|---|---|
| | Case Cash Express Inc | | $0 | $3,500 | 7/14/2020 |
| | Immediate Care Liaison Services | | $0 | $6,000 | 7/14/2020 |
| L | Liakas, Dean | LIAKAS | $2,000 | $0 | 7/14/2020 |
| | Priority Liaison Services, LLC | | $0 | $3,500 | 7/14/2020 |



| Lawyer/Firm | Contributor | Firm Name | $800-$2,499 | $2,500 or more | Date off the list |
|---|---|---|---|---|---|
| | Alge Funding Services | | $1,500 | $0 | 7/15/2018 |
| | Avanesov, Karen | | $1,500 | $0 | 7/15/2018 |
| | Case Cash Express | | $1,500 | $0 | 7/15/2018 |
| | Case Cash Funding LLC | | $1,500 | $0 | 7/15/2018 |
| L | Elefterakis & Elefterakis, PC | ELEFTERAKIS | $2,000 | $0 | 7/15/2018 |
| | Immediate Care Liaison Services | | $1,500 | $0 | 7/15/2018 |
| L | Kramer, Dillof Livingston & Moore | KRAMER | $1,000 | $0 | 7/15/2018 |
| | Lerman, Vadim | | $1,500 | $0 | 7/15/2018 |
| | Maksumov-Vaynshteyn, Yelena | | $1,500 | $0 | 7/15/2018 |
| | Priority Liaison Services | | $1,500 | $0 | 7/15/2018 |
| L | William Schwitzer & Associates, PC | SCHWITZER | $1,000 | $0 | 7/15/2018 |
| L | Wingate, Russotti, Shapiro & Halperin | WINGATE | $1,000 | $0 | 7/15/2018 |
| L | Zaremba Brownell & Brown PLLC | ZAREMBA | $1,500 | $0 | 7/15/2018 |

142.    It is alleged that each and all of the subsequent transactions by the Elefterakis-owned and/or operated "liaison" entities and other entities were undertaken by Elefterakis with property used to conduct or facilitate specified unlawful activity, and to promote the carrying on of specified unlawful activity, in violation of 18 USC § 1956(a)(1)(A).

143.     Notably, turning back to Kalkanis Scheme, referenced *supra*, the USAO stated that "To incentivize the Patients to get surgery, the Patients were paid approximately $1,000 after each surgery." The DOJ press statement did not reference *who* paid that money to the patients, but admitted fraudulent claimant, Wandy Diaz, provided testimony at trial that did:

> Q.  Did you receive money after having back surgery?
>
> A.  Yes.
>
> Q.  How much money did you receive?
>
> A.  A thousand dollars.
>
> Q.  Where did you get that money from?
>
> A.  Case Cash.

144.     In 2024, PSC Liaisons filed a biennial statement with updated information; specifically, an updated address of 2 Wall St., Suite 600, New York, NY, and an authorized representative named Ashley Cohen.

145.    That address is associated with another well-known company.



| Business Name | Address |
|---|---|
| GOLDEN PEAR FUNDING<br>Get Business Report | 2 WALL ST FL 6<br>NEW YORK, NY 10005-2051<br>NEW YORK COUNTY▾<br>(11/01/2020 - 05/01/2025) |
| **Match Names/Locations (up to 5)**<br>GOLDEN PEAR FUNDING | 2 WALL ST<br>NEW YORK, NY 10005-2001<br>NEW YORK COUNTY▾<br>(05/01/2025) |
| GOLDEN PEAR FUNDING HOLDCO, LLC<br>Get Business Report | 2 WALL ST FL 6TH<br>NEW YORK, NY 10005-2001<br>NEW YORK COUNTY▾<br>(03/2022 - 08/2023) |

### b)  *Walls, Abney, Porter, Buckman – and Pegasus*

146.    As the United States Attorney for the Southern District of New York identified in the Kalkanis Fraud Scheme, claimants used in the course of such schemes are often victims of their more sophisticated and culpable co-conspirators; claimants are often some of the "most vulnerable members of society – many of whom were poor, drug addicts, or homeless."

147.    In 2014 and 2015, Subin Firm undertook representation of Claimants Samantha Walls ("Walls"), Eric Abney ("Abney"), Terence Porter ("Porter"), and Susan Buckman ("Buckman"). Abney and Buckman were sporadically homeless. Porter, Abney, and Walls each had documented criminal histories and struggled with drug addiction.

148.    Abney and Walls had identical unwitnessed accidents six (6) days apart and perjured themselves regarding not knowing each other (Abney in fact signed for Walls's personal belongings at the hospital). Each of this group is connected by a shared witness who purportedly took pictures (Ebony Williams) and a known runner for Subin and another firm, Warren Buckman

– Porter's self-identified referrer, Abney's ex-partner (through her, Walls), and Susan Buckman's relative.

149.    Walls and Abney purportedly received surgeries <u>on the same day</u>.

150.    An independent radiological review of post-surgical films in Walls indicated entire portions of the surgery described in Dr. Avanesov's surgical report were not actually performed.

151.    The Walls case went to trial and resulted in a defense verdict. Subin withdrew as counsel after eight years on the Porter case and six years on the Abney case. Both cases wound up dismissed. The Buckman case was settled for an unknown amount.

152.    Warren Buckman subsequently received litigation funding from Pegasus for an accident purportedly in February of 2021; the case was never filed.

### c) Lupi and Amedico Scale with help from Park

153.    Also in 2015, two of the runners in the Kalkanis matter formed their operative corporate entity for a "spin-off," as discussed in the Second Circuit decision dated August 2, 2024, upholding their convictions from that operation:

> In 2015, Duncan and Kerry Gordon—another co-conspirator in the Kalkanis scheme—began a spin-off scheme. That scheme was substantially similar to the Kalkanis scheme, often using the same attorneys, doctors, and low-level co-conspirators. Duncan and Gordon created a business entity—D&G Premier Solutions LLC ("D&G")—to operate the scheme. D&G would connect recruits with litigation funding companies. D&G would receive a referral fee from a funding company after the company contracted with a recruit to provide payments in exchange for the recruit's future settlement amount.

154.     Lupi's entity JD Services was also formed in 2015 and operated in identical manner as set forth above. JD services would generate willing claimants to proceed with the Fraud Scheme, who would be connected with a litigation funding company for which JD Services would receive a referral or broker fee.

155.     One such funder was non-party Express Funding of America, LLC ("EFA"), where JD Services collected a broker fee between 10-15% pursuant to Court submissions filed in Index #: 653433/2024, Supreme Court of the County and State of New York, and upon information and belief, was one of the top two brokers generating a book of advances in excess of $22 million. In litigation surrounding the portfolio purchase, following the RICO action by Roosevelt Road Re Ltd. and Tradesman Program Managers, LLC against Subin and Lupi in 2024, EFA's portfolio buyer made demands for, *inter alia*, correspondence between Lupi and Subin related to the book. **It was noted that Lupi amassed nearly $2m in broker fees through building the EFA book.**

156.     In 2020, Lupi rebranded to Amedico Legal. He recruited through social media, local and internet-based Spanish-language press, and through hosting concerts and other events. Lupi specifically targeted illegal immigrants to use as his victims. Once on the hook, he enticed claimants with immediate funds from litigation funders, and a large payday in the future, if they cooperated. However, Lupi did not work for the claimants to provide them services; he worked for the funders and firms, providing them the true product – the "ideal" claimants – for fees and kickbacks.





Translation: "Your legal status doesn't matter within the United States to claim the benefits you have as a victim of an accident."

157. Upon information and belief, the business model remained as with JD Services, generating and brokering willing claimants to participate in the Fraud Scheme, but the standard procedure shifted to focus on brokering claimants first to particular law firms in addition to funders and included the unauthorized practice of law. During this time, Lupi was nominally working for the office of Gary S. Park, where he maintained a firm email address, falsely held himself out as

an attorney, and occasionally impersonated Workers' Comp adjusters, all while continuing to funnel cases reaching litigation to Subin Firm and broker out Claimants to Funding Defendants:

Atty: JORGE LUPI ( GARY PARK LAW )

PAT Date & Time: _____

ATTORNEY EMAIL:Jlupi@garyparklaw.com

**History of Present Illness**

The patient is a right handed 29 year old male who was involved in a Worker's Compensation injury on Onset date: September 27th, 2022. The injury occurred at the patient's place of work, PNA Contracting Corp, LLC in NYC, where the patient works as a Scaffold Builder. The injury occurred when the patient was carring a bag o concrete when he slipped and fell off a 9 feet ladder. The patient states impacting his left side of body. The patient admits to Cervical spine, left shoulder, left wrist, lumbar spine and let ankle being injured. The patient did contact the supervisor after the incident occurred. The patient was taken in an ambulance to One Brooklyn Health Hospital. The patient was given painkillers and then discharged from the hospital when deemed medically stable. The patient denies prior history of the symptoms mentioned. A Worker's Compensation case is now open. The Adjuster for the case is Jorge Lupi who can be reached at 718-445-1300. The established body parts for this case are Cervical spine, left shoulder, left wrist, lumbar spine and let ankle.



Procedure: ANTERIOR CERVICAL DISCECTOMY FUSION CERVICAL C4-5 C5-6 WITH SURGERY AS NEEDED





Attorney Info (If App) JORGE LUPI
Email: JLUPI@gARYparkLAW.com

ADVOCATE: ▮▮▮▮
REFERRAL SOURCE: JORGE LUPI
TREATMENT

| PRIMARY INSURANCE | | |
|---|---|---|
| Insurer: SUBIN & ASSOCIATES (JORGE LUPI) ID: | Insured's Name: ▮▮▮ | |
| | Group: | Birthdate: ▮▮▮ |
| SECONDARY INSURANCE | | |
| Insurer: | Insured's Name: , | |
| ID: | Group: | Birthdate: |
| MEDICAL INFORMATION | | |
| Date of Surgery: 08/08/2022 Diagnosis: | Anesthesia Type: | Surgeon: ▮▮▮ |

| Subin Associates | |
|---|---|
| Intake Sheet | |
| ALL of the following fields MUST be filled out OR filled out with N/A (Not Applicable) | |
| | Today's Date: 8-12-2022 |
| Name of Person filling out this form for Subin Associates: | EL Seyan |
| How did the client hear about Subin Associates? | Lupi |
| Emergency Contact if Client cannot be reached: (name/number/address/Email) | |

158.     Upon information and belief, this part of the scam was also not new or novel. Once again, the novel factor is its brazenness. From the <u>USA v. Rose</u> wiretap records:

182.     Additionally, Rose explained that he has a future plan for Ines as well.  During this conversation, Rose explained that he works with a female identified as Bella, who while not an attorney, completes all the necessary legal papers for the lawsuits resulting out of no-fault

fraud cases and then pays attorneys 15% of the case disposition in order to use their name on the paperwork and appear in court if necessary.  As Rose explained to Ines, Bella is "2(200), 3(300), 400 cases per year and she gives the attorney 15% just for the name."  Apparently, Bella is seeking to retire shortly and Rose has a plan to use Ines to copy the business model that Bella is using, however, Ines will be Rose's employee.  In that way, as Rose stated, he

> (Rose) will have the only part of this scheme that Rose doesn't currently control, the legal aspect. As Rose explained, he (Rose) will bring the energy, the clients and the investors and Ines will be doing all the work, the legal part, to make sure that no one is stealing Rose's money.[195]

159. Notably, the above was only possible through the knowing and voluntary involvement of Park; such scheme and the involvement documented above could only have transpired through deliberate agreement, knowingly false submissions of Opening and Closing Statements to the Office of Court Administration and other correspondence by mail or wire. Each such act constituted a violation and 18 USC §§ 1341 and 1343, and Plaintiff requires discovery to obtain same. Park derived monetary benefit from the scheme, and upon information and believe, used his position to function similarly to Evall, as a "buffer" and means for other attorneys to compensate Lupi, in violations of 18 USC §§ 1952 and 1956. Lupi also physically had a presence at the office:

> **NORBERTO MALDONADO** being duly sworn, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on the **17TH** day of **NOVEMBER 2021, 3:53PM** at
>
> **39-01 MAIN STREET**
> **SUITE 608**
> **FLUSHING, NY 11354**
> I served the **THIRD PARTY SUMMONS & THIRD PARTY COMPLAINT, EXHIBIT(S), NOTICE PURSUANT TO C.P.L.R.1007, NYSCEF CONFIRMATION NOTICE,** upon **YOSEF H. LEE, LAW OFFICES OF GARY S. PARK, PC, the ATTORNEY FOR PLAINTIFF,** therein named by delivering and leaving a true copy or copies of the aforementioned documents with **J LUPI (REFUSED FULL NAME), CO-WORKER,** a person of suitable age and discretion.

#### d) *Sosa, overlapping payoffs, and metadata*

160. Exemplifying these relationships is the matter of Edgardo Huaman Sosa ("Sosa").

161. In January 2023, non-party Liberty Funding (which was acquired by Experity Ventures/Nexify in 2022 – who gave Claimant A funding, *infra*), issued funding to a Subin

Claimant - Sosa - in an agreement signed off on by Defendant Baum on behalf of Subin Firm. It provided both an express kickback to Amedico, paid off Defendant Magnus/Best Case, and directed the check to be sent to Defendant Park's office as the Claimants' attorney (*ie*, to Lupi/Amedico), despite representation by Subin:



**NON-RECOURSE PURCHASE AND SALE AGREEMENT**

THIS AGREEMENT ("Agreement") made on this **6th day of January 2023** by and between Liberty Legal Funding I, LLC, a Delaware limited liability company, with offices at 1100 E Hector St, Suite 210, Conshohocken, PA 19428, its successors and assigns ("Liberty") and Edgardo Huaman Sosa ("Seller/Claimant"), residing at ██████████████████

**DISCLOSURE STATEMENT, PURCHASE AND CONSIDERATION**

　　Upon receipt of this executed Agreement and the other documents which are described herein (including but not limited to the Letter of Instruction and the Attorney Certification and Undertaking described in Exhibits A and B hereto, respectively), Liberty agrees to advance to Seller/Claimant the sum of **$142,931.02** (the "Cash Advance amount") **of which $10,000.00 now and then $3,000.00 monthly thereafter for 3 consecutive months starting on 02/01/2023 will be made payable to: Edgardo Huaman Sosa. A payoff in the amount of $106,930.42 will be made payable to: Best Case Management Services, Inc. Also, a $17,000.60 origination fee shall be payable to: Amedico Legal, LLC.** The Seller/Claimant hereby sells to Liberty the Seller/Claimant's right to receive certain proceeds which may result from the resolution of the claim more fully described in the first WHEREAS clause below and in accordance with the terms described below.

_Arnold Baum_
_____
SIGNATURE OF Arnold Baum, Esq.

　　　　Arnold Baum
_____　C.O.O., Subin Associates LLP
PRINT NAME　1/11/2023

> ☑ **Send check to my Attorney's office:**
> Name of Attorney Office and Address to send check:
> _____
> *Gary Park law office.* Claimant Initials _EHS_

162.     In October 2023, Defendant Pegasus bought out the Liberty advance above, along with charging, without further information, an "origination fee" in the amount of $19,879. This arrangement was once again signed off on by Defendant Baum. The check purportedly going to Sosa <u>was sent directly as an e-check to Amedico</u>.



**PEGASUS**

**ASSIGNMENT, SALE, SPRINGING ASSIGNMENT & EQUITABLE LIEN AGREEMENT**

**DISCLOSURE STATEMENT**

| | |
|---|---|
| A. Property to be purchased from the Seller under the agreement: | $20,000.00 |
| 1. Buyout (Payable to: **Liberty Pre-Settlement Funding, LLC**): | $178,789.99 |
| B. Applicable Fees to be added to and associated with the above amount: | |
| Origination Fee | $19,879.00 |
| Admin Fee | $500.00 |
| **TOTAL PURCHASE VALUE:** | **$219,168.99** |

**PAYMENT INSTRUCTIONS**

☒ **Option 1: eCheck** sent in my name via **Email** for same day delivery, if submitted before 5pm EST (<u>$75.00</u> added to your payoff amount at time of payment/satisfaction of our lien).

Email: Paulina@amedicolegal.com

Pegasus Fund, LLC
3505 Veterans Memorial Hwy, Suite D
Ronkonkoma, New York 11779

By: _____     Arnold Baum _____
Attorney Signature                   Print Attorney's Name

163.     Turning back to the first of several Best Case advances to Sosa - all signed off on by Defendant Baum on behalf of Subin Firm - the original advance paperwork, dated **June 28, 2021,** detailed an accident date of **June 23**, **2021**. Consistently, the hospital records in that matter indicate an ER visit with a claimed accident date of **June 23**, **2021**, as does the filed Complaint.

164.     However, the power of attorney form for Claimant EHS – giving power of attorney to Defendant Baum and non-parties Richard Eisen and Peter May, and notarized by Defendant L. Deleon – was signed, notarized, and dated **May 25, 2021, nearly a month before the purported date of accident**.

165.     The Best Case advance itself, dated **June 28,** 2021 for the purported **June 23,** 2021 accident, **contained metadata revealing the document was created by scanning the document – on June 12, 2021, 11 days prior to claimed date of accident.**



166.     Made plain, all of Sosa's paperwork was in place well prior to his "fall," all of such paperwork happening to know *precisely* on which date he would "fall." This is as clear of evidence as can exist that the "accident" was a staged event, and directly implicates Subin Firm, Baum, L. Deleon, Magnus, and Best Case.

167.     Further still, when Claimant EHS went to the hospital on date of "accident," he provided the following emergency contact:

| NAME OF SPOUSE/NEAREST RELATIVE - ADDRESS | RELATIONSHIP |  |
|---|---|---|
|  | **Cousin** |  |
| **ALVARADO, SUSANNA** | HOME PHONE |  |
| **111 CHESTNUT ST APT. 1** |  |  |
| **NEWARK** | **(862)309-9547** |  |
|  | BUSINESS PHONE | EXT. |
| **NJ    07105** |  |  |

168.     That phone number in reality ties to **Blanca Alvarado**, herself a Subin claimant under docket 152676/2021, with a shared address (very much not in Newark, NJ) with no less than **eight (8) other Subin Claimants, all of whom would be jettisoned later under the Lupi diaspora, *infra***.

### e)   *Lesly Ortiz and the Amsterdam Ave. apartment*

169.     In 2020, Subin undertook the representation of Lesly Ortiz – and ***seventeen (17)*** of her friends and family members all purportedly living in the same Manhattan apartment.

170.     Ms. Ortiz, then 23-years-old, with litigation financing in hand, was pushed into two (2) spinal fusions by Gerling, who Ms. Ortiz stated on the record she was sent to by the Subin Firm.

171.     Subin moved to withdraw in the Ortiz matter successfully and without consequence. Gerling was already paid a small fortune through the litigation funders for multiple surgeries related to the Ortiz ring. The carriers, on the other hand, had to bear the costs of a multi-year, complex litigation defense, experts, and attendant costs.

172.     The 23-year-old, with rods and screws Gerling needlessly drilled into her spine at cervical and lumbar levels for the intended financial benefit of the Defendants, presented herself

for oral arguments on a motion for summary judgment filed by the Defendants following Subin Firm's withdrawal. She conveyed the following information to the Court:

    a. Despite being a Medicaid recipient, and Gerling supposed to be in the role of treating physician, "Dr. Ge[rling], who was my surgeon for my spine, **refuses to see me unless I have a lawyer. He refuses to give me medication**… I only allowed my doctor to convince me when he said, 'You are going to feel better,' and I agreed to the surgery. **But I feel worse**."

    b. "Let's suppose that it is fraud between the doctors and the lawyers -- **they can hurt me.** They can do things against me."

```
        THE COURT:  Ms. Ortiz, I have a question for you.
  How did you find this doctor?
        MS. ORTIZ:  The lawyers recommended him.
```

173. Turning back once again to the Kalkanis Scheme, one of the attorneys involved, George Constantine, in fact appeared for a deposition well prior to being indicted. In November 2019, Constantine gave the following testimony, or lack thereof, regarding Gerling:

```
        Q.   Are you familiar with Dr. Michael
  Gerling?
        A.   I refuse to answer that question
  and I assert my Fifth Amendment privilege
  against self-incrimination.
```

*f)* *Identity theft and direct claimant allegations*

174.    In October 2022, in the matter of Carlos Enrique Ramirez-Naranjo, well documented by news coverage here[2] and here,[3] Subin Firm verified a complaint stating Mr. Ramirez-Naranjo was injured on a job site and suffered disabling injuries on August 17, 2022. Mr. Ramirez-Naranjo never suffered such injury and no attorney had ever met or spoken with Mr. Ramirez-Naranjo. The Subin Firm, in filing said complaint in furtherance of the Fraud Scheme, *via* the online New York State Courts Electronic Filing system ("NYSCEF"), committed a violation of 18 USC § 1343 on October 25, 2022.

175.    A workers' compensation claim was started, a lawsuit filed, and *someone* was attending physical therapy - but it was not Carlos Enrique Ramirez-Naranjo. Mr. Ramirez-Naranjo spoke at length with investigative journalists, and the clinic where PT was purportedly being performed confirmed, the person going to PT with Mr. Ramirez-Naranjo's information was not Mr. Ramirez-Naranjo, but was using an ID with his name and a different person's picture. It was further discovered that the PT facility's file for the imposter contained a Subin Firm intake packet, with a phone number handwritten on it connected to the then-"Office Manager" for Amedico/Lupi.

176.    Mr. Ramirez-Naranjo had been told he was filling out a job application, which was in English (Mr. Ramirez-Naranjo only speaks Spanish) and was told he would receive $15,000 just for filling it out. Sure enough, that check came in the mail – from a litigation finance company, and the "friend" who had filled out the paperwork took $13,000.

---

[2] https://abc7ny.com/stolen-identify-construction-worker-says-his-id-was-to-file-false-workers-comp-claim-and-lawsuit/14607751/

[3] https://abc7ny.com/imposter-posed-as-queens-man-for-doctors-visits-in-fraudulent-construction-fall-claim--7-on-your-side-investigates/14755461/

177.     **Defendant Baum of Subin Firm confirmed that the $15,000 came from Best Case, as well as acknowledged/claimed a "runner" was sent out who Mr. Ramirez-Naranja filled out firm intake paperwork with, and he was *then* set up with Best Case for funding.**

178.     However, Subin Firm later changed its version of events (report used pseudonym):

> We contacted the law firm regarding Daniel's claim that the fall never happened. They told us Daniel signed a retainer agreement and other legal documents with their firm six days after the alleged accident. We tried for months to get the documentation from the firm, but they declined to give it to us or to Daniel himself.

179.     Mr. Ramirez-Naranjo never filled out documents with the law firm or has ever been to their office, including six (6) days after the purported August 17, 2022 accident – he solely signed the documents presented by his friend, who was later discovered to be Jose Andres Brecino Arias (and who, importantly, *also does not read or speak English*).

180.     In an entirely independent matter, Mr. Briceno submitted testimony that the funding company he signed up with required him to pick up the advance check in person at the Subin Firm office at 150 Broadway, which he did, on July 22, 2022. Upon arrival at the Subin Firm, he met with a Hispanic male in his 30's, who told him he needed to sign documents in order to receive his check – which were entirely in English (which Mr. Briceno cannot read). Undisclosed in the stack of documents were documents to discharge his current attorney, and a Subin Firm retainer. Mr. Briceno provided an affidavit to this effect on August 22, 2022 (**Exhibit 5**) which was included in a motion filed by his actual attorney on August 24, 2022. Mr. Briceno set forth:

> 10. Had I known that the papers I was signing were to discharge THE LAW OFFICE OF ELI SHMULIK, and to retain SUBIN & ASSOCIATES, LLP, I never would of done so.
>
> 11. I believe I was deceived by the individual described above and effectively coerced into mistakenly discharging THE LAW OFFICE OF ELI SHMULIK PC so that I could continue to receive my litigation funding.

181.    The date Subin Firm claimed Ramirez-Naranjo had filled out paperwork was August 23, 2022, in the midst of the above, simultaneous with the same friend that signed him up for funding rejecting Subin's allegedly surreptitious representation.

182.    In March 2023, Sultan Al Maruf sued Subin Firm and Eric Subin in relation to their representation of him in an injury matter (705079/2023).  The allegations include, *inter alia*:

> 19.    Consequently, Defendant forced Plaintiff to get treatment by Defendant's selected doctors, even though most of them did not take Plaintiff's Medicaid payments. Said doctors billed Plaintiff with their asking price without the insurance company's negotiated price.

> 23.    Defendant then forced Plaintiff to accept 'Lawsuit Funding' from their selected company when Plaintiff was desperate for money. When Plaintiff wanted to get funding from 'Redwood Funding' that offered 15% apr every 6 months with No compound interest and No fees, Defendant declined to respond and did not sign the documents. However, as soon as Plaintiff agreed to get funding Defendant's selected funding company with insane amount of interest, compounded interest, and insane amount of fees, Mr. Subin immediately signed it.

### g) *Institutional-Grade scaling*

183.    On June 6, 2023, Magnus opened a Delaware entity, Best Case Originations D, LLC. On June 7, 2023, he opened another entity, RL SPV, LLC.

184.    On June 16, 2023, Justicia was incorporated with a registered address at Hernandez's condo.

185.    On June 21, 2023, Lupi opens a new entity, Amedicolegal Funding.

186.    RL SPV, LLC immediately finds its way into the portfolio Variant Alternative Income Fund (NICHX), an institutional-grade mutual fund (which is, of important note, subject to federal securities laws).  How this works is summarized below, **Fig. 1.**



187. Since it first appeared in the fund, the fund has increased its exposure to RL SPV, and in turn to Best Case Originations (in turn reliant upon the Fraud Scheme, Runner/Support Defendants, Medical Defendants, and Subin Firm), **by roughly 300%.** This is not surprising as the product offers a rate of return on a purported asset-backed debt product with over a 15% standard return. By comparison, Bernie Madoff's <u>average purported return was 10%</u>.[4]

188. Notably, by structuring in the otherwise redundant "Best Case Originations D" entity, the chain connecting the Fraud Scheme to the publicly visible RL SPV is broken except to those intently looking and with the right tools; obscuring any obvious relationship to what RL SPV is or does, or that proceeds are generated through direct litigant financing. It is notably placed in disclosures amongst entities which engage in inventory and law firm financing. This is a feature, not a bug, and it is intentionally and materially misleading even before touching upon the fraudulent nature of the underlying "assets" themselves; *i.e.*, securities fraud, a predicate act under 18 USC § 1961.

189. The snowball effect appears to be observed almost immediately. Between April 2023 and October 2023, Kristopher Hassett was employed by Cartiga, which is the resulting entity of a three-way merger between Legal Business Services (f/k/a Westbury Management Group), Ardec Funding, and LawCash, and which is now poised to go public by way of special purpose acquisition vehicle ("SPAC") – a process with lower compliance and disclosure obligations than a traditional IPO. There is a long history of interplay between these entities, their principals, and the Case Cash entities. Mr. Hassett sued Cartiga for wrongful termination, and his allegations are particularly relevant herein:

---

[4] <u>https://www.nasaa.org/4303/madoff-a-21st-century-ponzi-scheme/</u>

4. Respondent is in the business of providing funding to law firms and clients in connection with and in support of legal actions filed by law firms on behalf of their client.

5. Specifically, Respondent would fund medical procedures for claimants to undergo and provide loans to claimants based upon the value of their claim.

6. In some instances, Respondent's representations would encourage claimants to undergo medical procedures in return for increased personal funding in order to maximize the potential value of their claim.

9. In or about April 2023 through August 2023, I performed a risk assessment of Respondent's investments in funding of New York Labor Law § 240 claims.

10. During my assessment, I discovered what I, in good faith, belief to be a violation of New York law, statute, ordinance, and/or code: the funding and further supporting of fraudulent claims.

22. Upon recall and recollection and upon contemporary notes I took, during a meeting on August 29, 2023 with Mr. Boganski and Mr. Brady, I reported that a partner firm appeared to be all fraudulent with no identification or documents. Furthermore approximately $5,500,000.00 were funded against standard underwriting policy. I also stated that I saw similar issues at two other partner firms; but again was told it was none of my business.

190. On a recorded telephone call *that day* regarding concerns of the partner firm appearing to be *all fraudulent*, the topic at hand is the Fraud Scheme itself, the unsophisticated targets, and that they are ill-equipped to deal with the "Jorge Lup[i]'s of the world."

going to disappear, okay. But against the backdrop of, for instance, the Jorge Lupes of the world, we're not built on Jorge Lupe having all these clients. It was unsophisticated people who, they themselves had a case or they had a

friend who had a case, but they don't know a lawyer. They don't know -- bring anybody -- oh, bring it to Jorge Lupe, he gets cases funded. He gets lawyers. He'll get you a case. As if like, the lawyer is deigning, doing a favor to take it.

Okay, and so then, now, as it started to continue, people realize, I don't need Jorge Lupe, okay, and then there became spinoffs, and then the spinoffs tried to do the same deal as Jorge Lupe, and they did. But now, the spinoffs

from the spinoffs realize, I didn't need -- I don't need this. I can just do my own, but we tell them that things are different. Funding companies are looking into things more closely. This is -- maybe that gravy train is ending, blah, blah, blah. They're looking at things more closely, and so here is the new scenario. Okay,

RICHARD: Okay, I mean, I don't know if you guys want to talk about this, but I feel like we're all in it together. We all kind of know the deal, and I feel it's useful for me to share --

up the underwriting team. So we're just trying to find the right balance of a skittish underwriting team, and you're getting cast with the same brushes that we -- we work with Sube, and we work with Schweizer. We work with Windgate. We work with all these firms, and you

…..

involved. Chris has been involved, and we'd like to just, you know, we had a nice run with you, getting things in. And we're just getting a little bit more questions asked, so we want to make sure we have --

RICHARD: That's fine.

JIM: We'd rather not, but we understand that we may have to do a few favors for you. That's what I'm saying. But it's -- we don't --

```
        JIM:  Okay, that's good to hear.  I
didn't -- I don't know all the intricacies.  It's
just that -- we just want to come back with like,
a scenario, and then as things progress, as you
know, MRIs are positive, you know, the workers'
comp is not controverted, you know, the next step
is going to be the scope.  It's going to be a
possible fusion, and now I still don't think we
want to get to these big chunks of funding,
because it -- you know, then you've got to deal
with it down the road.
        I just like to give the client as
little money as possible that he's happy and he's
```

```
not going to leave you.  Like that, you know, we
want the client to be happy but not --
        RICHARD:  That's fine with me, yeah.
```

191.     The above constitutes a flat admission of the playbook. The *Kalkanis* playbook; the **Subin Firm playbook**. All being discussed openly – while at the same time, indicating this attorney doesn't want to be cast in the same brush as "Sube," and that Jorge Lupi is killing the golden goose with *too many* fraudulent claims.

192.     This conversation occurred precisely *as the wagons were being circled* and the more integrated relationship between Subin Firm, the Support/Runner Defendants, Lupi and his entities, and the Funding Defendants were being formalized - *to scale the Fraud Scheme further.*

193.    In December 2023 and in January of 2024, Ionian Re, LLC and Andromeda Advantage, Inc. (non-parties) issued warnings letters on their suspected fraudulent matters that they would be escalating their responses to such claims, including to the Subin Firm.

194.    Also in December of 2023 and January of 2024, Subin Firm dropped seven (7) additional cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate.

195.    In late January 2024, according to a later submission on their behalf (**Exhibit 6**), Subin Firm consulted with ethics counsel and James Catterson of Pillsbury Winthrop because of the Ionian/Andromeda letters and were advised by each <u>to withdraw from several hundred live cases because of what Subin described as a concern with a referral source</u>. The statement identified a referral source as person that does not exist at the address provided and carefully worded the submission to restrict such need to withdraw to exclusively labor law cases**.**

196.    Upon information and belief, and intensive diligence, there exists no such person listed as the referral source at the address given. The address given, however, is associated with Jorge Lupi, a Lupi affiliate, and Lupi-owned entities.

197.    These concerns <u>were expressly limited to labor law cases</u>. <u>This was by design.</u> No assurances to withdraw from motor vehicle accidents or, as here, non-labor law trip and falls. Sufficient red flags were admittedly enough to drop *hundreds* of labor law cases – but not motor vehicle accidents. Not trip and falls. Not ceiling "collapses."

198.    It is alleged this was by design. Not to rid the firm of fraudulent runners, referrals, and cases, but to cycle to new ones and ***rid the firm of <u>identified</u> runners, referrals, and cases***.

199.    In February 2024, Subin Firm dropped nineteen (19) cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate.

200.    In March 2024, Subin Firm dropped fifty-seven (57) cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate.

201.    In April 2024, Subin Firm dropped sixty-nine (69) cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate. Also in April 2024, Amedico/Lupi announced an extensive recruitment effort for TEAM JUSTICIA (Hernandez/Subin/Lupi). *I.e.*, cycling out for new, unflagged runners.



Translation: Extra Income!

**Join Our Team of Legal Advisors and Make a Difference!**

We present **TEAM JUSTICIA** and are looking for proactive and committed professionals to join our team of legal advisors. If you have social media skills and a wide network of contacts, this opportunity is for you!

**What Are We Looking For?** People with excellent social media management skills to identify and attract potential clients. Individuals with a broad network of contacts they can leverage to generate referrals. Professionals who want to help others by offering effective and personalized legal solutions.

**What Do We Offer?** The opportunity to earn attractive income with a flexible and scalable model. Ongoing training in the latest legal trends and practices. Continuous support from a team of experts in law and digital marketing.

**Requirements:** Preferably prior experience in sales or digital marketing. Excellent communication and networking skills. Motivation to work in a dynamic and collaborative environment.

If you're ready to take on this challenge and contribute to our mission of providing exceptional legal advice, **send us a brief description of how you could contribute via DM. We look forward to having you join us to make a difference in the lives of many!**

202.    On April 19, 2024, Amedico Legal Network, LLC and Amedico Holdco, LLC were opened in Delaware.

203.    In May 2024, Subin Firm dropped fifty-two (52) cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate.

204.    In June 2024, Subin Firm dropped twenty-six (26) cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate.

205.    Also in June, Amedico asserted they've handled over 1,000 cases over the last 13 years – *i.e.*, from 2011 forward, one year *prior* to the Sahiwal transactions; the new Team Justicia (Hernandez/Subin/Lupi) continued their focus on targeting those not here legally, beginning to shift their focus towards motor vehicle accidents.





206.    In July 2024, Subin Firm dropped twelve (12) cases through orders to show cause to withdraw, consent to change attorney, or passive failure to litigate.

207.    Contemporaneously, Lupi/Amedico/Justicia *ramped up their advertising further*, posting exponentially more on social media, bringing in influencer guests, with a continued focus on motor vehicle accidents targeting victims who are in the country illegally.



208. There was a further push to publicize their *expansion* to Miami, Las Vegas, California, and Texas.





209.    In July 2024, the Subin, LLP, and Eric Subin, PLLC entities were formed on the same day with the same address. From their formation forward, and continuing to date, Subin Firm cases began and continue to be moved over to Subin, LLP - merely a continuation of the Subin Firm-led Fraud Scheme. In December 2024, both entities open a joint credit line, secured by joint assets – specifically the joint receivables and open matters of the firms, and all other assets. This credit line was able to be opened (purportedly upon the value of firm inventory) despite that the first case to be opened or transferred to Subin, LLP did not occur until February 2025.

210.     Moving towards the end of 2024, the left hand continued to drop labor law cases, while the right hand cycled the fraudulent conduct towards slip and falls and motor vehicle accidents. Subin Firm continued engaging in precisely the same conduct and even further leaning in, incorporating a host of new entities - the majority of the Wall Street/Walk Street entity Defendants - all located on the 14th floor and run by Hernandez in December to further fleece Plaintiff, their own clients, and others.

211.     Defendants all continued to escalate their operations in furtherance of the Fraud Scheme. Lupi rebranded Defendant MKS to Latinos Legal Connections, and in November they were in attendance at what was billed as an attorneys-only, invite-only summit on how to scale firm growth.





212.     In the interim, a large number of the cases Subin Firm dropped have been picked up by McDonald "Don" Worley. Mr. Worley has outright acknowledged that Defendant Best Case

referred him to pick them up. Mr. Worley's new "paralegal" is the office manager from Amedico whose number appeared on imposter Ramirez-Naranjo's PT file (*supra*, ¶ 175).

> Otherwise, once I receive the file from prior counsel, I will forward you any evidence we have of the incident occurring and an IME I will have done with an expert.
>
> I have no idea who referred the case to Subin. I have been referred these cases from lenders with outstanding advances to clients.
>
> Have a good weekend,
>
> Don Worley
> Attorney At Law
> MCDONALD WORLEY, PC
> 1770 St. James Place, Ste. 100
> Houston, Texas 77056
> (713) 523-5500



**Don Worley**
Attorney at Law

**Office:** (713) 523-5500 | **TF:** (800) 610-2001 | **Fax:** (346) 335-4293
**Email:** don@mcdonaldworley.com | **Web:** www.mcdonaldworley.com
**Address:** 1770 St. James Place, Suite 100 | Houston, Texas 77056

---

**From:** Don Worley <don@mcdonaldworley.com>
**To:** Scott Haworth <scott.haworth@hbandglaw.com>
**Subject:** RE: ███████████████████████████████

The name of the funder is Best Case Funding. If you want to send me the outstanding discovery, I can respond and provide the documentation you request. I will of course make objections because I don't see the relevance of where the plaintiff borrows money just like it is not relevant where the defendant borrows money.

Let me know,

Don Worley
Attorney At Law
MCDONALD WORLEY, PC
1770 St. James Place, Ste. 100
Houston, Texas 77056
(713) 523-5500

213.   It is, in other words, business as usual, except while Subin Firm insists they are cleaning up shop, the criminal enterprise over which their "business" presides expands.

## IV.   THE FRAUD SCHEME ENTERPRISE

214.   From at least 2012 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) fraudulently misrepresenting pre-existing and degenerative conditions as acute trauma, transforming legitimate minor or localized injuries into lucrative full-body claims, and otherwise manufacturing purported injuries from whole cloth; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent personal injury lawsuits on behalf of Claimants, frequently directly related and within short temporal proximity; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such Claimants; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to prolong litigation, increase receivables and interest, and inflate or manufacture settlement value (the "Fraud Scheme").

215.   The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in **Fig. 2**.



216.    Once Claimants have been recruited, they each follow the same rote protocol, resulting in virtually identical surgeries.

217.    In order to inflate potential settlement value and thereby effectuate higher profit for the Defendants, Subin Defendants, directly and/or indirectly through the Runner and Support Defendants and/or others under their control, directed the Claimants to seek medical diagnosis and

treatment from certain associated medical providers with which the Defendants had an agreement or understanding as to the fraud scheme, including the Medical Provider Defendants, who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey.

218.     In this respect, the scheme bears striking similarity not only to *Rainford*, *supra*, but to the scheme as set forth in *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024), in which certain medical service providers "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions but rather are predetermined to find various injuries requiring extensive treatment." Id at 73.

219.     Here too, following initial evaluation of the Claimants by gatekeeper clinic personnel, the associated medical service providers (virtually always All Boro, Weiner, and Karafin) referred Claimants to physical therapy, injections, and to orthopedic and neurology consultations from associated medical service providers, including the Medical Provider Defendants, involved in the fraudulent scheme.

220.     A number of Medical Provider Defendants have utilized different corporate identities to at least partially hide what amounts to circles of self-referrals, such as wherein personnel from McCulloch will selectively use the NY S&J identity. The bulk of the gatekeeper clinic and auxiliary medical services are provided through PCs ultimately and in fact owned by Sandell, a chiropractor unauthorized to own practices providing services outside of chiropractic.

221.     As in *State Farm v. Tri-Borough*, implementation of the fraudulent treatment protocol requires that Medical Provider Defendants "routinely order unnecessary diagnostic tests

for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained…" 120 F.4th at 74.

222.    Here, the associated medical service providers routinely ordered a variety of imaging services in every single case – and in virtually every instance, MRIs of the cervical and lumbar spine, shoulders and knees – from certain radiologists (virtually always Kolb) involved in the fraudulent scheme, whose reports contain findings that routinely deviate from the claimants' conditions as set forth by the imaging studies themselves.

223.    Then, the associated medical service providers used these fraudulent imaging reports, but not the underlying imaging studies that either show degenerative conditions or fail to show any evidence of an acute injury, to help justify months of physical therapy sessions and injections for Claimants, which were then represented as being a course of allegedly failed conservative treatment in order to justify back and neck surgeries, shoulder surgeries, knee arthroscopies, etc.

224.    Despite the fact that the New York State Surgical and Invasive Procedure Protocol has long provided that "[t]he surgeon is responsible for assessing what films/images are appropriate for viewing before and during the surgery" (September 2006, at 8, available online at https://www.health.ny.gov/professionals/protocols_and_guidelines/surgical_and_invasive_proce dure/docs/protocol.pdf, last accessed January 13, 2025), the associated medical service providers routinely did not consult the MRI films themselves, but relied upon reports calculated to misrepresent the claimants' conditions as causally related to the alleged incidents, so that the otherwise unnecessary procedures would present with the patina of legitimacy. While the specific body parts at issue may vary amongst the claimants, the underlying scheme remained the same.

225.    The rote protocol treatment of the gatekeeper clinics (All Boro), in addition to the fraudulent imaging reports (Kolb), would then be used to justify pre-determined protocol surgeries by the Surgical Defendants.

226.    The Medical Provider Defendants provided false diagnoses, the use of their facilities and resources, and unnecessary, excessive, unwarranted, and costly medical services and/or medical services that were not causally related to the alleged accident, for which the Medical Provider Defendants received compensation through increased referral streams for these purposes, along with direct financial compensation through both Funding Defendants and *via* liens on Claimant files.

227.    Each of the Medical Provider Defendants understood and agreed that in turn for providing the false medical documentation needed for lengthier and more invasive treatment and thereafter correspondingly higher settlement values, the Subin Defendants would continue to funnel patients to their offices, with, upon information and belief, the ongoing assistance of the Runner, Funding, and Support Defendants. These Medical Provider Defendants further often split fees between upfront payments and asserted liens, to support, maintain, and increase their own receivables-based financing.

228.    Many of the Claimants are undocumented immigrants who do not speak English, as well as Claimants with substance abuse problems. The Claimants, as part of the Fraud Scheme, were instructed by the Runner and Support Defendants to fake their injuries and to receive a myriad of healthcare services that were unnecessary, excessive, unjustified and costly and/or not causally related to the alleged accidents. The Subin Defendants knew, were recklessly indifferent regarding, or reasonably should have known that the Claimants were faking their injuries and receiving

medical services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged accident.

229. Upon information and belief, as an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged accident, the Subin Defendants, Runner Defendants, and Support Defendants connected the Claimants to the Funding Defendants (including their own self-funding), who offered high-interest litigation funding loans to Claimants. The Claimants received a portion of the high-interest funding loan proceeds and the high-interest funding loans were secured by the settlement payments anticipated from Claimants' personal injury lawsuits. The Runner and Support Defendants further received "commissions," "broker's fees," "investigator fees," and the like for generating clients for the Funding Defendants. And, in the case of Subin Firm, Hernandez, WS Advances, Lupi, and Amedico Funding, a level of this funding was self-provided, in violation of ethical rules, obtaining a direct and adverse interest to clients which ran counter to resolving the claims promptly and for fair value.

230. The non-recourse nature of these payments, contingent on recovery, in conjunction with the snowballing interest, create intentional and manufactured upward pressure on case valuations and settlement demands needed to leave Claimants with anything of substance. Funding Defendants are the grease in the scheme's wheels, incentivizing surgeons with upfront payments for expensive surgeries which are not warranted, keep Claimants on the hook and induce them to undergo such surgeries, and drive up the proceeds of recoveries to the benefit of the Legal Defendants and their contingency fees, all while making otherwise usurious rates of return.

231. Upon information and belief, the Runners, including the Runner Defendants, also received a portion of the illicit recoveries, some of which may have further been diverted to

recompense organized criminal elements for arranging the unlawful immigration of claimants, whom they transported around the New York metropolitan area.

232.     The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiffs and others, began in or before 2012, and continues to the present day.

## V.     FURTHER PATTERN OF RACKETEERING ACTIVITY HAVING DIRECTLY HARMED PLAINTIFF

233.     Attached as **Exhibit 7-A through 7-H** are relevant records regarding exemplar cases brought by Subin which are part of the Fraud Scheme, and which have directly damaged Plaintiff. Each Claimant denominated by letter herein corresponds to the records contained in the relevant sub-exhibit (*i.e.*, Claimant D's records are contained in Exhibit 7-D).

234.     Consistent with the USAO's observations in the Kalkanis scheme, the claimants involved here include the "most vulnerable members of society – many of whom were poor, drug addicts, or homeless." Notably, each and all treat with All Boro. Each and all ultimately undergo surgeries despite minimal or no objective findings on the date of accident. The majority are Medicaid and/or Medicare recipients but are instructed not to use it – to the benefit of the Enterprise.

### i.  Claimant A

235.     Claimant A (**Exhibit 7-A**) is documented through various non-Defendant medical providers, including a hospital visit for unrelated reasons four (4) months after her purported accident alleged to have occurred on January 9, 2022, to have significant mental health issues, repeated toxicology results positive for cocaine and opiates, and to be facing eviction in or around Claimant A's involvement in the fraud scheme. She treats on liens, and takes out funding, despite having Medicaid.

236.    In a Verified Complaint verified by Peter May, at the Subin Defendants' direction, alleged that Claimant A had fallen while ascending stairs on or about January 9, 2022.

237.    Upon information and belief, Claimant A was recruited by the Runner and/or Support Defendants, and retained Subin on or about January 20, 2022.

238.    In Plaintiff's first Fraud Scheme Medical Provider visit, on February 7, 2022, with Weiner of All Boro,[5] Claimant A purportedly complains of back pain, bilateral shoulder pain, right knee pain, right foot pain, and left wrist pain. Weiner purportedly finds significant range of motion restrictions in Claimant A's cervical and lumbar spine, bilateral shoulders, left wrist, and right knee, and an abnormal gait. Claimant A is referred for lumbar, left wrist, and right knee MRIs. Weiner notes the injuries are caused by a January 9, 2022 accident and that Claimant A sought treatment from her PCP around 3 days afterwards.

239.    Claimant A's only treatment record with her PCP from this time is from January 14, 2022. It was very much not for any kind of fall on the stairs, but from catching her dress on fire from a candle she had lit:



**Chief complaint**
conf coming at 9 am  (Appt time: 12:30 PM) (Arrival time: 11:15 AM)56 year old female reports her house dress catching on fire 3 days ago causing 3rd degree burns to her butt and leg areas pt reports 10/10 on the pain scale.

240.    Of note, the January 14, 2022 record was provided with Subin Firm's exchange of medical records in discovery. They had it, they were aware of its contents, and knowingly, falsely asserted a manufactured story.

---

[5] One (1) year and twenty (20) days before the New York State Department of Health sustained charges against Weiner of failing to keep adequate and accurate records, practicing incompetently, and all five (5) charges of ordering unwarranted tests and treatment, issued a two-year stayed suspension, and permanently precluded Weiner from prescribing any controlled substances, permanently precluded him from providing any surgical, interventional, or invasive treatments expressly including injections

241. In doing so, and in verifying to the truth of the knowingly false Verified Complaint, filed on NYSCEF March 2, 2023 in furtherance of the Fraud Scheme, Subin Firm committed a violation of 18 USC § 1343.

242. Further, in mailing a knowingly false Bill of Particulars on or about July 11, 2023 in furtherance of the Fraud Scheme, Subin Firm committed a violation of 18 USC § 1341.

243. Weiner, and all of the Fraud Scheme Medical providers, consistently noted no prior injuries or medical history except hypertension and a prior left knee surgery. Had *any* of them in fact reviewed the relevant records, they would have discovered Claimant A had a history significant for sciatica (*i.e.,* impingement, radiculopathy) and pre-existing lumbar herniated discs. This was, of course, not done, because the goal was not treatment based on the patient's actual needs, but to further the Fraud Scheme.


56y with hx of HTN, predm, asthma, sciatica, herniated disc (lumbar), abdominal hernia (enlarging over years) presents for major burn on Left thigh, left fingers, and right buttock. Pt states that her skirt caught on fire at home from a candle a few days ago. Pt did not go to the hospital. She states she used A & D ointment & aloe. She also has been taking motrin 800mg Q6h PRN & percocet 10mg TID. Pt denies SOB,CP,or any palpitations. finally, patient requested refill for her Biscodyl for chronic constipation.

244. Claimant A had a subsequent visit with Weiner on or about April 22, 2022, which is substantially similar, and Claimant A is sent for MRIs of her right shoulder, cervical spine, and lumbar spine.

245. MRIs were performed by Kolb. Each and every one of his reports is contradicted by later peer review of the films.

   a. Kolb claims the MRI showed multiple tears. Peer review found no tears, only degenerative fraying, and notes Kolb omitted, *inter alia*, the plainly evident tri-compartmental osteoarthritis.

b. Kolb claims the MRI showed a tear in the left wrist and various abnormalities. Peer review again found no tears and that Kolb omitted that the abnormalities were plainly degenerative.

c. Kolb stated in the lumbar MRI that a herniation was present in L5-S1. Peer reviewed confirmed this finding (in a patient with pre-existing documented sciatica with a pre-existing herniated disc), and noted Kolb omitted the severe arthropathy and prominent degenerative disc disease at L5-S1.

246. Kolb emailed these knowingly false reports to defense counsel on the matter on or about July 21, 2023. This correspondence, in furtherance of the Fraud Scheme, was a violation of 18 USC § 1343.

247. Claimant A later consulted with Gallina in October 2022. Gallina again noted the accident was alleged to happen on January 9, 2022, and that she did not seek medical attention until a week later (which, if Gallina – a *surgeon* – had reviewed such records, were related to Claimant A lighting herself on fire). Gallina finds severe cervical and lumbar range of motion restrictions. On this first visit date, Gallina suggests, and Claimant A agreed, to move forward with a lumbar fusion. Gallina further suggested Claimant A, a 56-year-old drug addict with documented sciatica and a herniated disc, undergo a cervical fusion as well if she failed "conservative treatment" including "pilates and/or yoga."

248. Both before (May 2022) and after (November 2022) the visit with Gallina, Claimant A saw non-Fraud Scheme Medical Providers related to other issues. Indeed, in the November 2022 non-Fraud Scheme visit, the following notations are made during a review of systems, flatly inconsistent with Gallina's findings:

Neck: No stiffness, no pain, no tenderness, no noted masses.



Musculoskeletal: No pain in muscles or joints, no limitation of range of motion, no paresthesias or numbness.
Neurologic: No weakness, no tremor, no seizures, no changes in mentation, no ataxia.

249.     Claimant A further had a hernia treated in December 2022. Once again, none of the

Fraud Scheme Medical Provider Defendants' manufactured findings were observed:



All other systems reviewed and negative.,ENT: Neg,Heart: Neg,Resp: Neg,GI: Neg,GU: Neg,Skin: Neg,Neuro: Neg,Psych: Neg,Musculoskeletal: Neg,Endocrine:
Neg,Hematologic/Lymphatic: Neg,Allergic/Immunologic: Neg,Constitutional Sxs: Neg,Eyes: Neg,

**Exam / Objective**
Date/Time of Exam: 12/15/2022 12:30:41 MD Name: Shin, Peter
GA: Awake A&Ox3
Skin: No pallor/ rashes warm & moist
HEENT: Moist Mucous Membranes No Icterus
Neck: NT Full ROM No JVD
Lung/Chest Wall: Lungs-Lungs CTA No Ret/Chest Wall-Chest Wall NT
Cardio Vascular: RRR S1S2
Cognitive Status: No Impairment

250.     Gallina provided similar findings and claims in a January 2023 visit, despite the

above. He once again suggests multiple fusions.

251.     Gallina emailed these knowingly false records on or about December 9, 2024, in

furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

252.     When Claimant A was deposed, she was presented with photographs of what

purportedly caused her fall, pre-marked with the allegedly offending condition circled.



253. Claimant A had no idea who took the photograph, or who made the circle, was not present when the circle was made, but agreed that the circled condition is what caused her fall (despite the only contemporaneous record from the time having nothing to do with a fall).

```
Q    Do you know who put the red marks on the
photograph?
A    No.
Q    When you see the red markings, where the
circle is and an arrow pointing to the circle, is
that where your accident happened?
A    Yes.
Q    Were you sitting with your attorneys or
anybody from the law office, when these circles were
made?
A    No.
Q    As you sit here today, do you know who
made the circles and the arrow?
A    No.
```

254.    This matter remains pending.

## ii. Claimant B

255.    Claimant B (**Exhibit 7-B**) disclosed her firearms trafficking conviction when deposed in her case but omitted her very recent 2023 conviction for possession of a controlled substance in Pennsylvania. Claimant B also similarly has a history of mental health issues.

256.    Claimant B purportedly tripped and fell on November 3, 2020. She in fact fell November 2, 2020, it "was not a hard fall," she had no ROM limitations, and her complaints were limited to muscle soreness.

28 y/o F denies pmhx p/w L hip pain and left leg pain after fall onto left side 2 hrs PTA. Says was not a hard fall and does not believe anything is broken but is feeling a soreness in her muscles now, worsened when bending and twisting. Is able to ambulate without distress. Denies numbness/tingling, weakness, bowel or bladder incontinence, f/c, dizziness, syncope, cp, sob.

Tenderness: There is no abdominal tenderness.
**Musculoskeletal:**
   Comments: **Hip and leg without deformity, no redness, swelling, bruising, hip joints aligned, no bony hip or leg tenderness, +mucular tenderness over hip, gluteal region and left thigh, leg FROM, full strength, SILT, 2+ distal pulses**
**Neurological:**
   General: No focal deficit present.
   Mental Status: She is alert and oriented to person, place, and time.
   Gait: Gait normal.
**Psychiatric:**
   Mood and Affect: Mood normal.

Diagnosis management comments: 28 y/o F denies pmhx p/w L hip pain and left leg pain after fall onto left side 2 hrs PTA. Likely muscle strains, low c/f bony injury and patient does not wish to have XRs, agree given low c/f fracture. Will treat pain and direct further care to her pcp.

257.    On November 16, 2020, Claimant B has a tele-health visit with her PCP, who makes no indication of any injury complaints, and notes she is able to do her usual activities.

General Allergy Assessment:
c/o Primary problems are worse. c/o chronic cough. c/o Nasal congestion. c/o itchiness.
Denies : Skin problems. Denies : Rash.
Anxiety:
Anxiety F/U stable, on medication. Medications tolerating new meds well
-. Stressors stable. Panic attacks none. Energy change normal energy.
**ROS:**
General/Constitutional:
General no weight loss or gain, no weakness, no fatigue, able to do usual activities.
Neurologic/Psychiatric:
Neurology no fainting, no seizures, no weakness, no numbness, no tingling, no tremor,
good coordination, good memory and speech. Psychiatry no nervousness, no tension, good
mood, no current suicidal ideations, no unusual perceptions, no obsessions or compulsions.

258.   Importantly, the PCP notes it is a tele-health visit because due to "Covid-19," as "patient is not willing to leave the house" and risk getting "infected with Covid-19 during travel to the doctor's office."

259.   Meanwhile, **<u>on the same day that it's noted Claimant B refused to leave the house for treatment</u>**, All Boro claimed Claimant B treated with Karafin for the first time, complaining of left wrist, left hip, neck and back pain. Despite Medicaid, she treated on a lien.

260.   November 30, 2020 Claimant B returned to the PCP, eighteen (18) days after the purported accident.  She complained solely of back pain and stated it started three (3) days ago.

261.   Upon information and belief, after being recruited by Runner and/or Support Defendants, Claimant B retained Subin Associates sometime on or before December 1, 2020. Meanwhile, Claimant A testified that:

> Q. So how much time passed from the accident to when you first went to All Boro?
>
> A. About a week. I'm not sure. A week or two.
>
> Q. How much time passed from when you first went to All Boro until when you first spoke with an attorney?
>
> A. Couple of months.

262. On December 18, 2020, Claimant B saw her PCP. No related complaints were made.

263. Claimant A was referred by Weiner for an MRI of the left shoulder. Claimant B went to a non-Fraud Scheme provider, who did not find any tears, and found solely wear and tear, extensive degeneration, and a down-sloping acromion – a developmental defect.

264. Weiner *sent her back for another MRI less than a month later,* to Kolb, to provide a more Fraud Scheme-friendly MRI, and Kolb obliged, claiming a non-existent tear in Claimant B's left shoulder, and entirely omitting the degenerative conditions.

265. Kolb forwarded these knowingly false reports *via* fax to opposing counsel in the underlying matter, in furtherance of the fraud scheme, on or about March 23, 2023, in violation of 18 USC § 1343.

266. In December 2021, Claimant B treated with Wert for the first time. The inconsistent MRIs were not reconciled, and he diagnosed a labrum tear. He immediately recommended a left shoulder arthroscopy. A year and a month after date of accident, where Claimant B had "not a hard fall" and had minor injury claims to her left hip and thigh, Claimant B claimed 9/10 left shoulder pain.

267.     Claimant B returned to Wert on February 22, **2023**. Claimant B, despite the year and three (3) month gap in treatment, claimed she was still experiencing pain in the left shoulder, with no improvement of her symptoms. Wert once again diagnosed a tear and suggested surgery.

268.     Wert e-mailed these records on March 20, 2023 which were knowingly false and/or knowingly omitted material information, in furtherance of the fraud scheme, and in violation of 18 USC § 1343.

269.     On April 30, 2021, Peter May of Subin Firm, at Subin Firm's direction, filed a Verified Summons & Complaint in Claimant D's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

270.     The case remains pending.

### iii.   Claimant C

271.     Claimant C (**Exhibit 7-C**) was purportedly injured in a trip and fall incident on February 19, 2019. On February 21, 2019, Claimant C retained Subin Firm. Between Claimant C, her sister, and her daughter, the 2019 case represents the *seventh* injury case they've pursued with Subin in as many years, and Claimant brings another injury claim in 2024.

272.     Claimant C goes to the emergency room on February 21, 2019, two (2) days after the accident and the same day Subin Firm is retained, complaining of lower back and bilateral leg pain. She is noted to have full range of motion throughout and has no obvious signs of injury. She is at the hospital for less than 2 hours and no diagnosis is given.

273.     Claimant C begins treatment with Karafin and All Boro on March 18, 2019, a month later. Despite Medicaid, she treats on a lien. She now complains of neck, back, upper sacrum, and right shoulder, and claims to have gone to the hospital within a few hours of accident.

274.     Bestcare purported provided physical therapy. Each and every report, from treatment modality to unidentified stamped signature, are identical.

 

275.     July 1, 2019, All Boro and Karafin provided trigger point injections and referred Claimant C out for an EMG.

276.     In October 2019, Karafin provided further trigger points, and purportedly performed the EMG. The results were knowing misrepresented as "evidence of" radiculopathy; the EMG was a clinically negative test for radiculopathy. A diagnosis would require abnormal findings of "spontaneous activity," "along with normal SNAP and CMAP findings," in "specifically one paraspinal muscle and 2 limb muscles supplied by the same nerve root but innervated by different peripheral nerves." National Institute of Health, Electrodiagnostic Evaluation of Lumbosacral Radiculopathy, Last Updated: September 26, 2022.

| Side | | Muscle | Nerve | Root | Ins Act | Fibs | Psw | Amp | Dur | Poly | Recrt | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Right | | L3-4 Parasp | Rami | L3-4 | Nml | 0 | 0 | | | | | |
| Right | | L4-5 Parasp | Rami | L4-5 | Nml | 0 | 0 | | | | | |
| Right | | L5-S1Parasp | Rami | L5-S1 | Nml | 0 | 1+ | | | | | |
| Left | | L3-4 Parasp | Rami | L3-4 | Nml | 0 | 0 | | | | | |
| Left | | L4-5 Parasp | Rami | L4-5 | Nml | 0 | 0 | | | | | |
| Left | | L5-S1Parasp | Rami | L5-S1 | Nml | 0 | 0 | | | | | |

**EMG**

| Side | Muscle | Nerve | Root | Ins Act | Fibs | Psw | Amp | Dur | Poly | Recrt | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Right | VastusMed | Femoral | L2-4 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Right | AntTibialis | Dp Br Peron | L4-5 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Right | Peroneus Long | Sup Br Peron | L5-S1 | Nml | 0 | 1+ | Nml | Nml | Nml | Nml | |
| Right | MedGastroc | Tibial | S1-2 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Right | Iliopsoas | Femoral | L2-3 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Left | VastusMed | Femoral | L2-4 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Left | AntTibialis | Dp Br Peron | L4-5 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Left | Peroneus Long | Sup Br Peron | L5-S1 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Left | MedGastroc | Tibial | S1-2 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |
| Left | Iliopsoas | Femoral | L2-3 | Nml | 0 | 0 | Nml | Nml | Nml | Nml | |

**IMPRESSION:**

The above electrodiagnostic study reveals evidence of right L5 - S1 radiculopathy. The above electrodiagnostic study also reveals evidence of mild bilateral peroneal neuropathy.

277.    Maximum Ortho mailed the false records of All Boro and Bestcare, in furtherance of the Fraud Scheme, on or about July 22, 2020, in violation of 18 USC § 1341.

278.    On April 17, 2019, Claimant C was referred to Kolb Radiology where she received three MRIs.

279.    On December 11, 2019, Claimant C presented to McCulloch for treatment. Claimant C's complaints were now regarding her neck and right shoulder. Without reviewing Claimant C's full chart, McCulloch causally related the complaints to the accident and immediately recommended surgery.

280.    On March 29, 2022, Claimant C, over three (3) years from date of purported accident, presented for an initial consultation with Gerling, who found significant range of motion

limitations not present on date of accident, and without reviewing Claimant C's full chart, Gerling causally related the complaints to the accident and immediately recommended a L5-S1 discectomy after the McCulloch surgery.

281.    Gerling emailed the knowingly false records on or about June 23, 2023, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

282.    Upon information and belief, the references by McCulloch to awaiting authorization for the surgery referred not to Medicaid or other plan, but to Claimant C securing funding.

283.    On or about February 12, 2020, at Subin Firm's direction, Lee Huttner of Subin Firm filed a Verified Summons & Complaint in Claimant D's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

284.    On or about April 21, 2020, at Subin Firm's direction, Lee Huttner of Subin Firm mailed a Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

285.    On or about April 25, 2022, at Subin Firm's direction, Lee Huttner of Subin Firm mailed a Supplemental Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

286.    The case remains pending.

#### iv. Claimant D

287.    Claimant D (**Exhibit 7-D**) was allegedly injured in a trip and fall incident on May 6, 2018. She went to the hospital and complained exclusively of left ankle and left knee pain. No decreased range of motion was observed in any body part (with full range of motion found throughout), nor numbness, swelling, or any indicia of any injury to any body part whatsoever; the only findings were subject complaints of pain and "stiffness" in the left ankle and knee.

288.    Upon information and belief, after being recruited by Runner and/or Support Defendants, Claimant B retained Subin Associates on or before May 8, 2018.

289.    On May 21, 2018, Claimant D had her first evaluation with Karafin at All Boro. On that same day, Claimant D began physical therapy treatment at All Boro. Claimant D purportedly continued her physical therapy treatment with All Boro from May 21, 2018 until November 5, 2018. On September 17, 2018, Karafin recommended Claimant D to an orthopedic surgeon for her right shoulder, right knee, and right ankle.

290.    Claimant D was referred to Kolb Radiology by Karafin and received multiple MRIs. As is tradition, the entirety of Kolb's reports are found inconsistent with the films upon later peer review, with either complete omission of degenerative findings, and/or manufactured traumatic findings:

        a.  Review of the right shoulder MRI (an injury not complained of on date of accident) demonstrated "These findings are all chronic. These findings are not posttraumatic. These findings are not secondary to the alleged injury. There are no findings on this exam causally related to the claimant's alleged injury."

        b.  As to the lower back, "MRI of the lumbar spine performed five months following the date of the claimant's alleged injury demonstrates degenerative

disc disease and degenerative arthropathy which is chronic and degenerative and not posttraumatic. There are no posttraumatic findings evident on this exam. There are no findings on this exam causally related to the claimant's alleged injury."

c.  As to the left knee MRI, "I disagree with the primary reader's findings of meniscal tear. I disagree with the primary reader's findings of tear of the anterior cruciate ligament. There is evidence of sprain of anterior cruciate ligament; however, there is no evidence for tear. There is evidence of high-grade-within Hoffa's pad suggesting focus of fat pad impingement which was not reported by the primary reader. MRI of the left knee performed one month following the date of the claimant's alleged injury demonstrates sprain anterior cruciate ligament. There is also evidence of high-signal within Hoffa's fat pad suggesting focus of fat pad impingement which is not causally related to the claimant's alleged injury."

d.  As to the left ankle, evidence of a partial tear of the extensor hallucis longus was noted, "I concur with the primary reader's findings of abnormal extensor hallucis longus tendon and anterior and posterior talofibular ligaments; however, there is no evidence of tear of the ligaments. There is only sprain present." Review of the later MRI, taken prior to the left ankle surgery (wherein Kolb claimed ATFL and PTFL tears but admitted the healed partial tear), again found no such tears as claimed, found signs of *recent* trauma, as well as concurred with healing of the partial tear: "MRI… performed one year and seven months following the date of the claimant's alleged injury demonstrates

sprain of the anterior and posterior talofibular and deltoid ligaments which appear somewhat recent. Extensor hallucis longus tendon abnormality is evident which appears decreased from prior exam suggesting a degree of healing when compared to the prior exam."

291.    Kolb mailed his reports, with knowingly false contents and material omissions, on or about August 17, 2023, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

292.    On November 5, 2018, Claimant D returned to All Boro for a follow-up appointment, where Weiner (seeing Claimant D for the first time, in lieu of Karafin), without explanation, conducts cervical range of motion testing and refers Claimant D to an orthopedic surgeon.

293.    On November 14, 2018, Claimant D was evaluated by McCulloch at NY S&J. Surgery was recommended on the first appointment by McCulloch.

294.    On May 2, 2019, McCulloch performed left knee surgery on Claimant D, in furtherance of the Fraud Scheme, at a surgical center in New Jersey. In doing so, McCulloch "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of the Fraud Scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952.

295.    The records from the May 2, 2019 surgery indicate the surgery was performed upon payment from a Funding Defendant; however, no UCC has ever been filed regarding same as required to perfect a secured interest. The records indicated, under "Additional Ref. Doctors," that the referral source for the surgery was Subin Firm.



Additional Ref. Doctors
Referral Source        Subin & Associate

296.    Claimant D was in a motor vehicle accident on or about September 7, 2019, and went to the hospital with complaints of neck and back pain. This incident was not disclosed by Subin Firm and records authorization not provided until mandated by Court Order in 2022.

297.    After over a year of no treatment at All Boro, Claimant D returns for a follow-up appointment (post-subsequent accident) with Weiner on November 11, 2019, where Weiner, once again, recommends surgical intervention as a treatment option and refers her to an orthopedic surgeon.

298.    On November 18, 2019, after Weiner's referral, Claimant D returned to NY S&J, now for her ankle, over a year and half post-date of alleged accident. Claimant D is again referred to Kolb Radiology for an MRI, which they receive on December 26, 2019. On January 2, 2020, Claimant D returns to NY S&J, and surgery is scheduled.

299.    On July 24, 2020, Claimant D underwent another surgery, in furtherance of the Fraud Scheme, this time on their left ankle and once again in New Jersey. In doing so, NY S&J (under direction of McCulloch) "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of the Fraud Scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952.

300.    The July 24, 2020 surgery took place over two (2) years from date of purported accident. This surgery was also paid for by funding, despite no UCC having been filed and despite the availability of Medicaid.

301.    All Boro faxed their records to opposing counsel on the underlying matter, knowingly false and containing material omissions, on or about September 10, 2020, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

302.    McCulloch and NY S&J mailed the records to opposing counsel on the underlying matter, knowingly false and containing material omissions, on or about October 8, 2020, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

303.    On or about May 29, 2019, at Subin Firm's direction, Peter May of Subin Firm filed a Verified Summons & Complaint in Claimant D's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

304.    On or about February 1, 2020, at Subin Firm's direction, Maria Zieher of Subin Firm mailed a Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

305.    On or about November 19, 2020, at Subin Firm's direction, Maria Zieher of Subin Firm mailed a Supplemental Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

306.    On or about July 25, 2023, at Subin Firm's direction, Lee Huttner of Subin Firm mailed an Amended Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

### v.  Claimant E

307.    Claimant E (**Exhibit 7-E**) claimed injury from a trip and fall which purportedly occurred on July 19, 2017. Claimant E at varying times claimed he fell on a staircase, backwards off of a ladder, that the ladder slipped to the right and he fell; and, at examination before trial,

under oath, varying between the floor was cracked, that it was uneven, and finally that the floor gave way, under both legs of the ladder at the same time, and at Plaintiff fell from a height, striking his head on the way down on a sink and his hip on the floor, before an 80-lb. ladder fell on top of him. He "broke his head, was bleeding, hit [his] hip," was on the floor for either "5 minutes" or "ten seconds," and couldn't feel his feet and he couldn't look, yelled at his co-worker not to help pick him up. After this horrifying, traumatic event, with devastating injuries:

```
Q.   What did you do next?
A.   I went home.
```

308.    Claimant E claimed his co-worker, a listed witness in the case, drove him home. Claimant E claimed to go to Wyckoff Hospital the *following* day on July 20, 2017. **Wyckoff Hospital has repeatedly denied having any records of such visit**. At examination before trial, Claimant E testified he complained of back, head, bilateral leg, and bilateral feet pain at the hospital.

309.    Upon information and belief, after being recruited by Runner and/or Support Defendants, Claimant E retained Subin Firm on August 7, 2017.

310.    Claimant E gave testimony that the first medical provider he saw post-accident was Gerling, approximately fifteen (15) days after the accident, at the same facility as All Boro. Claimant E further testified that Gerling was the one that referred him for MRIs, PT, chiropractic, and otherwise, on that first date.

311.    Notably, at the time of the examination before trial, the surgery had not occurred yet, because per Gerling's instructions, Claimant E needed "to speak to my attorney so they come to an arrangement for this surgery."

```
Q.   Did you ever have that surgery?
A.   Not yet, because he said to speak to my
attorney so they could come to an arrangement for
this surgery.
```

312.    Meanwhile, Gerling's records indicate they had their initial consult in January 2018.

313.    On August 11, 2017, Claimant E treated with a non-Defendant chiropractor, who noted Claimant E was on a ladder that slipped to the right causing him to fall.

314.    The records indicate that on August 21, 2017, over a month post-purported accident, Claimant E started treatment with All Boro and Karafin, claiming to have fallen down a flight of stairs. Claimant E's complaints were limited to head and lower back. Claimant E was referred for MRIs to Kolb.

315.    Also on August 21, 2017, Claimant E saw RJR and Ciancimino, who noted full range of motion in Claimant E's cervical spine. It was noted Claimant E fell backwards off of a ladder.

316.    On August 26, 2017, Claimant E had MRIs of the brain and pelvis. The brain MRI was noted to be negative for acute pathology. The pelvic MRI stated an "impression" of nondisplaced fractures in the S4 and 1st coccygeal segment, with gluteus tears. The "findings" portion of the report indicates this was based solely on purported observation of marrow edema and specifically noted "no further evidence of fracture or osteochondral defect." On August 28, 2017, Claimant E has cervical and lumbar MRIs. The cervical MRI finds bulges which are purportedly redemonstrated on December 18, 2017. The lumbar purportedly demonstrated a small L5-S1 herniation. Another MRI of the hip is dated September 12, 2017. A tear of the gluteus is noted, with no fractures noted, inconsistent with the just-prior MRI, and not reconciled.

317.    At RJR with gastroenterologist Ciancimino (in the same physical facility) on September 5, 2017, Claimant's complaints were "minimal neck pain, spasm of upper trap, and c/o headache." The billing form claims Claimant E fell off of a ladder.

318.    Claimant E returned to All Boro and saw Karafin on September 25, 2017. Karafin noted the MRI findings including "only a small herniated disc at L5-S1," seemingly disregarded the pelvic finding, and stated Claimant E would be referred out to an orthopedic surgeon specifically for his hips.

319.    On October 18, 2017, Claimant E is seen by a PA at NY S&J. The PA, despite noting the purported gluteal tear in the hip on MRI, diagnoses a labral tear of the hip. NY S&J sent these knowingly false and otherwise materially misleading records to opposing counsel on the matter in furtherance of the Fraud Scheme, by mail on or about June 7, 2020, and by fax on or about June 8, 2020, in violation of 18 USC §§ 1341 and 1343.

320.    Claimant E returned to All Boro and saw Weiner (for the first time, in lieu of Karafin) on December 4, 2017. In apparent complete disregard of Karafin's prior visit (or not having reviewed it) Weiner makes no reference to the hip issue, referred Claimant E to a spine surgeon, and noted they were holding off on PT until cleared by the spine surgeon (despite that PT had been purportedly already prescribed several times and was purportedly being actively undergone at RJR).

321.    At the January 2018 consult with Gerling, purportedly the initial visit per the records (contradicted by testimony), Claimant E's complaints now extended to neck, back, right shoulder, right elbow, right wrist, right hand, left shoulder, left elbow, left wrist, and left hand; the mechanism of injury was noted as a fall from height. It is noted no Workers' Comp file had been opened. The record indicated Claimant would return for injections to Reyfman, a provider there is

no record Claimant E ever treated with. MRIs of cervical and lumbar are referenced as demonstrating C3-4 and C5-6 bulges and an L5-S1 herniation. No reference whatsoever is made to the hip and pelvic MRIs. The record indicated denial of headaches and other symptoms purportedly complained of to Karafin and Weiner.

322.    Claimant E returns to Gerling in March 2018. Gerling noted a failed injection there is otherwise no record of. Over 50% thoracic range of motion is noted, otherwise absent from any other record. It is further noted that an EMG demonstrated C6 radiculopathy, despite that the only EMG performed was clinically negative. Claimant E returns to Spine Care in April 2018, with similar claimed findings, now noting a phantom EMG which demonstrated bilateral L5-S1 radiculopathy, and Claimant E is scheduled for a discectomy. Identical findings and recommendations were made at a May 2018 visit. The same findings and recommendations are reiterated in a July 2018 visit. Every record indicated symptoms have worsened since the last visit.

323.    Gerling sent the knowingly false and otherwise materially misleading records from Spine Care by way of fax on July 9, 2019 and again on July 15, 2020, in furtherance of the Fraud Scheme, and each a violation of 18 USC § 1343.

324.    On or about December 6, 2019, Claimant E presented for an independent medical examination (accompanied by "Ana, an IME companion"), and claimed to have injured his head, neck, mid-back, lower back, bilateral shoulders, bilateral elbows, bilateral wrists, bilateral hips, bilateral knees, and bilateral ankles.

325.    On or about June 12, 2020, Maximum Ortho sent records of RJR, All Boro, and Kolb, by fax to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

326.    On or about September 12, 2017, at Subin Firm's direction, Robert Eisen of Subin Firm filed a Verified Summons & Complaint in Claimant E's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

327.    On or about May 24, 2019, at Subin Firm's direction, Peter Andrews of Subin Firm mailed a Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

328.    Claimant E's matter ultimately settled.

329.    Claimant E was later the first-named Defendant in action by Liberty Mutual to disclaim coverage for fraud related to two (2) "swoop and squat" staged motor vehicle accident rings; as to Claimant E, involving an accident in January 2022 and an accident in April 2022. Claimant E underwent an EUO in that matter, where the following testimony was given:

    a.  He was gifted the car that was involved in one of the accidents, by a friend whose name he can't remember, who lives in North Carolina, whose number he used to have, but his phone is broken.

    b.  **Claimant E claimed pain and injury in varyingly his neck, back, head, shoulders, waist, legs, and arms.  He went to an entirely different set of doctors. Notably:**



```
    Q    Have you had any previous injuries to
the body parts that you're currently receiving
treatment for?
    A    No.
```

330.     In yet another car accident case, this one arising from 2023, the witness from Claimant E's matter – the co-worker who purportedly witnessed the accident and drove Claimant F home – filed suit as the passenger of a vehicle. The driver of the vehicle? **Claimant E**.

### vi.   Claimant F

331.     Prior to Claimant F's purported accident, he was previously sentenced to a year and four (4) months prison time for tampering with physical evidence. Medical records indicated a prior hospitalization for a gunshot wound.

332.     Claimant F (**Exhibit 7-F**) shared an address with another Claimant Subin represented in a 2018 matter – who treated with All Boro, Kolb, and underwent surgery with Avanesov.

333.     Claimant F's brother has two open motor vehicle accident cases with Harmon Linder, and Claimant F's niece has another motor vehicle accident case open with Harmon Linder, all arising out of different dates of accident.

334.     Claimant F claimed injury from a purported trip and fall incident on December 16, 2019.

335.     First responders noted the complaints at the scene as "non-trauma." Complaints were limited to a generic complaint of neck pain, headache, and slight dizziness, and all other complaints were denied. Claimant F's neck was observed as normal. Claimant F arrived at the hospital at 6:42 PM. Claimant F noted no loss of consciousness but that he awoke in the ambulance. Per the attending doctor, Claimant was unable to reconcile these statements and loss of consciousness was marked "unclear." Complaints were then purported head trauma, neck and back pain, and neck pain was then denied. On physical exam, Claimant F was noted to be in no distress, and the only subjective complaint was of lumbosacral tenderness.

336.    **There was no objective indication of any injury. His breathing was unlabored; there was no obvious signs of trauma.** Claimant F was given an Advil and a Tylenol, and was discharged by 7:29 PM, less than an hour after arrival.

337.    Claimant F signed a power of attorney form with Subin Firm on December 17, 2019. Upon information and belief, Claimant F was recruited by the Runner and/or Support Defendants.

338.    Claimant F first treated with Karafin at All Boro on January 10, 2020, twenty-five (25) days after the date of purported accident. His complaints were now "neck, lower back, and especially the right ankle." He further complained of loss of hearing in the right ear. Karafin purportedly found restricted range of motion in the cervical and lumbar spine, as well as subjective pain in the right ankle, and claimed to observe an antalgic gait.

339.    Claimant F was referred to Kolb Radiology for three MRIs and a CAT scan. Claimant F began physical therapy at All Boro from January 21, 2020 until March 13, 2020. Claimant F was seen again by Karafin on February 14, 2020. The complaints were virtually identical, and Karafin purportedly found an over 80% reduction in lumbar flexion. On March 3, 2020, Weiner performed a lumbar injection.[6] On April 3, 2020, Claimant F returns to Karafin, who recommended an EMG as "his lumbar spine MRI is not suggestive of pain levels that the patient has right now." Karafin again purportedly performs range of motion testing and does not discuss Claimant F's 500% improvement in lumbar flexion. On May 8, 2020, Weiner performed another lumbar injection.[7]

---

[6] Of the kind he was prohibited from ever doing again after a 70+ page finding of incompetence, unnecessary overtreatment, and poor record-keeping.
[7] Of the kind he was prohibited from ever doing again after a 70+ page finding of incompetence, unnecessary overtreatment, and poor record-keeping.

340.     Claimant F saw Weiner in consultation capacity in lieu of Karafin for the first time on June 19, 2020. Weiner recommends him to a spine specialist to give a second opinion before receiving a second injection (despite having just performed same a month prior). On August 7, 2020, Weiner noted that the injection "did not help alleviate his pain," despite that no injection had occurred between the June and August visits. Claimant F was again recommended to the spinal surgeon. On October 9, 2020, Weiner finally takes note that he gave Claimant F an injection in May. He is recommended to continue with Gerling and PT.

341.     All Boro sent these records, knowingly false and/or containing material omissions, by mail to defense counsel in the matter in furtherance of the Fraud Scheme on or about January 21, 2025, in violation of 18 USC § 1341.

342.     On February 3, 2020, Kolb performed MRIs on Claimant F's cervical spine, lumbar spine, and right ankle. As to cervical, Kolb claimed to find bulging discs impinging upon the thecal sac at C4-5 and C5-6. As to lumbar, Kolb claimed to find a herniated disc at L5-S1 with impingement upon the thecal sac. As to the right ankle, Kolb claimed to find a torn PTFL. As to the right ear, Kolb found sclerosis of the right mastoid as well as inflammation.

343.     Later peer review, consistent with pattern, found false positives detailed in Kolb's reports, along with material omissions:

  a.   "MRI of the cervical spine performed one month and two weeks following the date of the claimant's alleged injury demonstrates mild degenerative disc disease. These findings are chronic and degenerative and not posttraumatic. These findings are not casually related to the claimant's alleged injury. These findings predate the alleged injury."

b. "MRI of the lumbar spine demonstrates mild early degenerative changes of the discs. I disagree with the primary reader's findings of disc herniation at L4/5 as there is no evidence of disc herniation present. I concur with the primary reader's findings of disc bulge at L5/S1 and there is also evidence of disc bulge at L4/5. There is also evidence of congenitally short pedicles which was not reported by the primary reader."

c. "I disagree with the primary reader's findings of tear of the posterior talofibular ligament as the posterior talofibular ligament appears normal in signal and morphology without evidence for tear or sprain. I concur with the primary reader's findings of evidence of fluid in the tibiotalar joint; however, this is physiologic in volume which was not reported by the primary reader. Minimal lateral ankle subcutaneous edema is evident which was not reported by the primary reader. Chronic mild peroneus brevis tendinosis is evident which was not reported by the primary reader."

d. "CT scan of the internal auditory canals performed one month and one week following the date of the claimant's alleged injury demonstrates osseous changes of the right mastoid air cells suggesting a prior mastoiditis. This is not a posttraumatic finding. This is not secondary to the alleged injury. There are no findings on this exam casually related to the claimant's alleged injury."

344. Kolb mailed his reports, with knowingly false contents and material omissions, in furtherance of the Fraud Scheme, to opposing counsel on or about December 6, 2024, in violation of 18 USC § 1341.

345.    Claimant F purportedly treated with Gerling Institute for an initial consult on September 25, 2020. The listed referral source is "AllBoro Rehab Steve," which is neither Karafin nor Weiner's first name. Claimant F is listed as female and repeated referred to as "Ms." And is directly referred to as a "32 year-old female" in the exam notes, despite Claimant F very much being male. Gerling Institute noted a grossly stable gait. A lumbar fusion is immediately suggested

346.    Claimant F returns and purportedly sees Gerling on December 29, 2020. He is still listed as female and repeatedly referred to as "she." Notably, "she" admits to current usage of illicit drugs. Despite acknowledging that the EMG results for the cervical and lumbar spine were both normal studies – studies that were to rule out radiculopathy, **and did** -

> **IMPRESSIONS:**
> **There is no electrophysiologic evidence suggestive of a neuropathic, radiculopathic or myopathic process. This is a normal study.**
>
> **REASON FOR REFERRAL:**
> Patient was referred to our practice for electrophysiologic testing to rule out bilateral lumbar radiculopathic process.

- Gerling diagnosed a herniation with radiculopathy, and decided upon a discectomy with possible annuloplasty for Claimant F; who, on date of accident, spent less than an hour at the hospital, had no objective sign of injury, and was treated with a Tylenol.

347.    Notably, the non-Defendant doctor who performed the EMG performed his own, entirely negative physical examination:

**General:** Negative for fever, chills, weight gain, weight loss, fatigue or lack of appetite.
**HEENT:** Negative for headache, dizziness or syncope.
**Respiratory:** Negative for shortness of breath or cough.
**Cardiovascular:** Negative for chest pain or palpitations.
**Gastrointestinal:** Negative for heartburn, abdominal pain or bleeding.
**Musculoskeletal:** Negative for joint pains or arthritis.
**Neurological:** Negative for balance or coordination problems.
**GU:** Negative for bladder or bowel incontinence.
**Hematological:** Negative for bleeding disorders or anemia.
**Psychiatric:** Negative for depression or anxiety.

348.    On March 25, 2021, Gerling performed a discography, discectomy, rhizotemy, annuloplasty, and intradisc injection. Unusual on two fronts, as:

      a.   According to a purported "expert," a discography is typically used when there is a question of which specific disc is the problem; whereas here, the entirety of the surgical plan already centered, without ambiguity, upon the L4-5 level:

## Diagnosis of Discogenic Pain

Diagnosing discogenic pain involves a thorough medical history, physical examination, and imaging studies such as X-rays, MRIs, or CT scans. Discography, a specialized diagnostic procedure, may also be used to identify the specific disc causing the pain.



Gerling Institute; as of May 7, 2025.[8]

      b.   The NYU facility records indicate a laminectomy was performed; Gerling's operative report does not reflect this at all.

---

[8] https://gerlinginstitute.com/conditions/discogenic-pain/

SPECIMENS REMOVED:

| ID | Type | Source | Tests | Collected by | Time | Destination |
|---|---|---|---|---|---|---|
| 1 : disc | laminecto my | Disc | SURGICAL PATHOLOGY | Michael Christopher Gerling, MD | 3/25/2021 0829 | |

349.     Notably, there are no records of any follow up appointments with Claimant F.

350.     Gerling sent these records, knowingly false and/or containing material omissions, by email to defense counsel in the matter in furtherance of the Fraud Scheme on or about December 6, 2020, in violation of 18 USC § 1343.

351.     Also notable, Claimant F purportedly required an interpreter at examination before trial.  Meanwhile, in the hospital on date of surgery:



LANGUAGE & COGNITION
What is the primary language of the patient\guardian?: **English**
In what language do I prefer to hear my health care information?: **English**
Is an interpreter required?: **No**



Interpretation Services (if necessary)
Type of Interpretation *
◉ None  ◯ Remote  ◯ In Person

352.     When Claimant F testified at deposition, he stated that All Boro was recommended to him by someone at the hospital.  He further testified that All Boro "helped him with everything." Claimant F clarified:

FIRST AMENDED COMPLAINT                                                                113

> Q. Mr. ████, when you say they helped
> you with everything, what do you mean by that?
>
> A. Well, I meant that Medicaid covered
> everything, so they did physical therapy,
> acupuncture, and I was able to know there
> everything that had to be done with me, because I
> did not want to go back to the hospital.
>
> Q. How about your physical therapy? How
> were those bills paid?
>
> A. Medicaid covers them.

353. All Boro treated on a lien, not Medicaid, as did Kolb and Gerling.

354. On or about July 17, 2021, at Subin Firm's direction, Peter May of Subin Firm filed a Verified Summons & Complaint in Claimant F's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

355. On or about April 27, 2022, at Subin Firm's direction, an unidentified attorney from Subin Firm mailed a Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

356. Claimant F's case was settled pending trial.

### vii.   Claimant G

357.    Prior to the subject claim, Claimant G was convicted in Florida for cocaine trafficking, wherein he conspired to purchase three (3) kilos of cocaine; and in a separate conviction, for soliciting another to commit prostitution. Notably, the paperwork regarding the former charge indicated Claimant G was already considered disabled. He was sentenced to fifteen (15) years incarceration.

358.    Claimant G (**Exhibit 7-G**) was allegedly injured in an incident involving a ceiling falling on them on March 8, 2018. Claimant G went to the hospital late the following day, March 9, 2018, with complaints of left shoulder pain and headache.  All other complaints were denied. Claimant G was observed to have a "small, superficial scratch" on his head. He was noted to have normal gait but ambulated with a cane. As per the attending, "no need for CTH as no evidence of trauma and its been 1 day, no l[oss] o[f] c[consciousness] or other signs of increasing ICP." Claimant G received X-rays of his chest and left shoulder, both of which were normal outside of degenerative findings. Claimant G was noted to move all extremities, was not in acute distress, and no visible signs of injury noted. He was given Motrin and discharged.

359.    On March 12, two (2) days after the hospital, Claimant G treated with his PCP for varicose veins and underwent a transcatheter occlusion. No reference to an accident or any other complaints were noted.

360.    On March 26, 2018, Claimant G treated with his PCP.  He complained solely of bilateral leg swelling and pain. There were no complaints of any other pain and review of systems was negative less the leg swelling. No mention was made of the March 8, 2018 accident.

361.    On April 5, 2018, Claimant G again treated with his PCP. He complained of neck, back, and left shoulder pain, with the shoulder pain being the primary complaint, and he referenced

the March 8, 2018 accident as the cause. It was noted he has two total knee replacements, chronic

phlebitis/cellulitis in the left leg with chronic, severe pain for which he has been taking Vicodin

since at least 2017.

> **Additional Comments:** Pt reports pain continues and is requesting a referrla for an evaluation by an orthopedic provider. Reports has Pain & numbness of Left arm at times

362.    Claimant follows up with his PCP in December 2018 where a mass was located in

his lung, and again in March 2019, where it is noted **he has stage 4 cancer and is in clinical trials.**

History of trauma notes the prior knee surgeries but makes no note of the claimed March 2018

accident. No complaints of shoulder, back, or neck complaints were made, nor observations of

injuries or concerns to these areas upon physical exam.

> 2.   Pain level at 6 / 10 today.   wants to stay with his Vicodin as it has served him well over the years, for now.

363.    Claimant G signed a power of attorney form with Subin Firm on **May 3, 2018**.

Upon information and belief, Claimant G was recruited by the Runner and/or Support Defendants.

364.    Claimant G first treated with Weiner at All Boro on **May 4, 2018** – nearly two (2)

months after the date of purported injury and one (1) day after being recruited by Subin Firm. The

injury suffered was now alleged to be head, shoulder, and right wrist, with complaints of pain to

neck, right wrist, left shoulder, and headaches. Weiner immediately gave Claimant G injections.[9]

Claimant G went back to Weiner on June 1, 2018, and was referred to a left shoulder surgeon -

Wert.

---

[9] Of the kind he was prohibited from ever doing again after a 70+ page finding of incompetence, unnecessary overtreatment, and poor record-keeping.

365.     On June 28, 2018, Claimant G treated with his PCP. Solely complaints of knee pain were made.  Claimant G had a similar appointment with his PCP on July 3, 2018, where only knee complaints were made.

366.     Claimant G returned to Weiner on July 6, 2018, wherein Claimant G's first complaint of lumbar spine pain was made at All Boro. Weiner referred him to a spine surgeon - Gallina. Claimant G follows up with Karafin on November 9, 2018 – who referred him to a neurosurgeon. Claimant G was given an additional injection on February 1, 2019 by Weiner.[10]

367.     The entirety of treatment was on a lien despite the availability of Medicare. There is no mention in All Boro's records regarding Claimant G's stage 4 cancer or other relevant medical issues. The complaints made to, and the purported observations and findings made by, All Boro are flatly inconsistent the complaints to and findings by the PCP. It is clear the purpose of All Boro's involvement was not "treatment," but to fast-track Claimant G to *some* kind of surgery as soon as possible.

368.     This is all the more apparent where the records demonstrate the medical treatment, and receivables thereto, were directly benefitting likely the same participants of the Fraud Scheme as the litigation financing.  All Boro's billing records in this matter reflect their use of the MedTRX software system, which is part and parcel of the medical cash advance package[11] owned by, and MedTRX billing software itself individually owned by, Neal Magnus – **the owner of the Best Case/RL SPV vertical, and who co-owns a patent regarding medical records with Defendant Herbert Subin.** *I.e.*, it is likely that overtreatment in this matter directly benefitted the enterprise

---

[10] Of the kind he was prohibited from ever doing again after a 70+ page finding of incompetence, unnecessary overtreatment, and poor record-keeping.

[11] *See generally* <u>Carothers, M.D., P.C. v GEICO Indem. Co.</u>, 13 Misc 3d 549 (Kings Civil, August 17, 2006) ("Neal Magnus, the chief executive officer of Medtrx, LLC, Medtrx Capital, LLC and Advanced Healthcare Solutions, LLC… "Advances" are "cash advances" made to plaintiff from time to time… Each advance is "due and payable" on the first business day following the date that is 12 months after the applicable "Advance Date."

in redundant and self-reinforcing fashion. Notably, the MedTRX medical advance vertical has ballooned to include the following, including another SPV entity likely sitting in one or more security instruments, and appears to have formed the "playbook" for the later growth of Best Case:

     a.  MedTRX Management Company, LLC;

     b.  MedTRX Provider Network, LLC;

     c.  MedTRX PPO, LLC;

     d.  MedTRX Capital, LLC;

     e.  MedTRX Collection Services, LLC;

     f.  MedTRX Healthcare Solutions, LLC;

     g.  MedTRX Holdings, LLC;

     h.  MedTRX HSR Special Holding Company, LLC;

     i.  MedTRX HSR SPV, LLC.

369.    All Boro mailed these reports, with knowingly false contents and material omissions, in furtherance of the Fraud Scheme, to opposing counsel on the matter on or about April 2, 2019, in violation of 18 USC § 1341.

370.    Claimant G received multiple MRIs at Kolb Radiology; Kolb issued reports on the MRI films which included knowingly false positives, false attributions, and material omissions. Service was provided on a lien despite Medicare. Later peer review demonstrated:

     a.  As to the cervical MRI dated May 8, 2018: "I disagree with the primary reader's findings of disc herniations at C3/4, C5/6 and C6/7. There is evidence of prominent multilevel degenerative disc disease and degenerative arthropathy resulting in levels of narrowing which was not reported by the primary reader. MRI of the cervical spine performed two months and one week following the

date of the claimant's alleged injury demonstrates multilevel degenerative disc disease and degenerative arthropathy. These findings are chronic and degenerative. These findings are not posttraumatic. Minimal anterolisthesis of C7 secondary to the associated degenerative changes at this level is noted. There are no posttraumatic findings evident on this exam. The findings on this exam predate the patient's alleged injury and are not casually related to the claimant's alleged injury."

b. As to the lumbar MRI dated: "I concur with the primary reader's findings of disc herniation at L3/4 and there is also evident of annular tear which was not stated by the primary reader. I disagree with the primary reader's findings of disc herniations at L4/5 and L5/S1. There is evidence of multilevel degenerative disc disease and degenerative arthropathy with congenitally short pedicles resulting in stenosis which was not stated as such by the primary reader. MRI of the lumbar spine performed three months and nineteen days following the date of the claimant's alleged injury demonstrates multilevel degenerative disc disease and degenerative arthropathy with congenitally short pedicles resulting in levels of stenosis. These findings are all chronic and degenerative and not posttraumatic. These findings predate the alleged injury and are not secondary to the alleged injury. There is evidence of a disc herniation with annular tear at L3/4 and a left paracentral extending to left foraminal location which appears recent and therefore could be secondary to the alleged injury. This however is superimposed upon prominent degenerative disc disease putting the disc at risk for disc herniation and annular tear."

371. Kolb mailed his reports, with knowingly false contents and material omissions, in furtherance of the Fraud Scheme, to the Court on or about May 16, 2023, in violation of 18 USC § 1341.

372. On June 5, 2018, Claimant G has an initial consultation with Wert. He now complained of right wrist, left shoulder, cervical, and lumbar pain. After an ER visit where he was given Motrin and discharged with no obvious signs of trauma, after Claimant G waited a month to seek any treatment, Claimant G here, two (2) months post-date of accident, claimed to have 10/10 pain. Wert claimed that based on the "unfavorable response to conservative treatment," he was, on this first consultation, recommending arthroscopic surgery –Claimant G's conservative treatment at this juncture consisted of 5 PT visits. There is no apparent follow up with Wert.

373. Notably, on July 11, 2018, Claimant G treated with an unrelated non-Fraud Scheme doctor referred by his PCP. The following important notes were taken:

> Also reports history of mild bilateral headaches, 1-2x/week, last about an hour, doesn't take any pain meds. Has had these headaches for many years, no recent changes, not bothersome.

> Meds:
> xarelto
> vicodin prn for severe pain from arthritis
>
> General: NAD
> HEENT: mmm
> Neck: supple, full ROM, no LAD
>
> Gait: romberg negative, steady narrow-based gait, able to heel/toe/tandem w/o difficulty

374. On August 29, 2018, Claimant G had an initial consultation with Gallina, who purportedly observed over a 50% ROM reduction in Claimant G's lumbar and cervical spine – one

month after Claimant G's PCP observed full range of motion and three (3) months before Mt. Sinai physicians similarly observed full range of motion. On this first visit, Gallina recommends a two-level discectomy and fusion in a 70-year-old's neck and a three-level fusion in his lumbar spine. In preparation, Gallina provides Claimant G a brochure on "low bak pain" (*sic*). There is no indication Gallina has reviewed a single record except Kolb's MRI report, no consideration of comorbidities, and no discussion of prior medical or surgical history. Gallina claims the surgery is the choice of Claimant G as "he has decided not to have these injections as he is fearful of the side effects… and deems these to be temporary in nature" (despite having injections from Weiner in May 2018 and February 2019).

375.    On November 29, 2018, Plaintiff was hospitalized for four (4) days after going to the emergency room for shortness of breath. At no time during the stay is neck pain complained of, and is in fact denied, while back pain was complained of. Claimant G was repeatedly found to have normal range of motion throughout.



Associated symptoms: leg pain, swelling and chest pain.no fever, no vomiting, no headaches, no PND, no syncope, no abdominal pain, no cough, no wheezing, no sore throat, no neck pain, no sinus pain, no swollen glands, no rash and no coryza.

Constitutional: Positive for appetite change. Negative for chills, diaphoresis, fatigue and fever.
HENT: Negative for congestion, sinus pain and sore throat.
Eyes: Negative for photophobia and visual disturbance.
Respiratory: Positive for chest tightness and shortness of breath. Negative for cough and wheezing.
Cardiovascular: Positive for chest pain and leg swelling. Negative for syncope and PND.
Gastrointestinal: Negative for abdominal pain, diarrhea, nausea and vomiting.
Genitourinary: Negative for dysuria, frequency, hematuria, penile pain and urgency.
Musculoskeletal: Positive for back pain and myalgias. Negative for gait problem and neck pain.
Skin: Negative for color change, pallor, rash and wound.
Neurological: Positive for dizziness and light-headedness. Negative for tremors, seizures, syncope, speech difficulty, weakness, numbness and headaches.
Psychiatric/Behavioral: Negative for confusion.

Neck: Normal range of motion. Neck supple. No JVD present. No tracheal deviation present.

Musculoskeletal: Normal range of motion. He exhibits edema and tenderness. He exhibits no deformity.

376.    On May 1, 2019, Claimant G returned to Gallina, who found identical, to the degree, severe restrictions as the visit ten (10) months prior (despite interim findings of full range of motion). Gallina once again recommended an aggregate 5 levels of spinal fusions, and again noteed same as being in part due to Claimant G's fear of injections (which he had no problem with purportedly receiving from Weiner). There is no mention of the fact Claimant G has stage 4 cancer or how this factored into surgical considerations.

377.    On May 29, 2019, Claimant G had another visit with Gallina.  The entirety of the report is a direct copy-paste of the May 1, 2019 visit, except it is now noted:

> Today he informs us that he will need to hold off on his surgery until he has finished his radiation therapy. This will be on 6-4-19. We will obtain his medical clearances from his oncologist and his primary care physician.

378.    Despite this, no discussion of why he was getting radiation, or consideration on surgical recommendations.

379.    A July 24, 2019 visit with Gallina in an identical report as the prior, still noted the need to "hold off" until June 4, 2019, despite that it is over two (2) months past that date.

380.    A July 31, 2019 visit with Gallina yielded identical findings, and Claimant G was scheduled for surgery at Hudson Regional Hospital on Sept. 16, 2019.

381.    Notably, Gallina during this time and thereafter, was affiliated with CitiMed, a series of clinics owned by Regina Moshe. Hudson Regional Hospital is owned by Yan Moshe (Regina's brother).

382.    Yan Moshe is also the landlord to the majority of the CitiMed clinics, and also received 10% of CitiMed revenue right off the top for various services for his "billing services" through an entity called "Star Solutions," including any New Jersey-based services.



```
        Q    You said you also use an outside
billing company; is that correct?
        A    Yes.
        Q    Who is that?
        A    Star Solutions.

        Q    Do you know who owns that?
        A    Yan.
        Q    Do you have a written agreement with
that company?
        A    I don't remember.
        Q    What is the fee structure in relation
to that billing company?
        A    Ten percent of the receivable.
```

383.    New Jersey services from Citimed physicians – such as Gallina – were sometimes billed through the New Jersey "CitiMed Services PA," and checks to Star Solutions have been signed directly over to Yan Moshe's medical receivables advance company, Med Capital LLC.



384.　Another physician from CitiMed recently testified that when CitiMed physicians – like Gallina - plan surgery, they go to Hudson Regional Hospital "because CitiMed [is] affiliated," pursuant to an unknown "business arrangement."

```
A    That surgery was at Hudson Regional Hospital.

Q    Where is that located?

A    In Secaucus, New Jersey.

    Q    Were all of your surgeries performed in the New Jersey
location?

    A    At that time, possibly.

    Q    Is there a reason why you make a patient from Queens
drive to New Jersey?

    A    Because CitiMed was affiliated with those locations.

    Q    When you say affiliated, did CitiMed own or operate
them, how did that work?

    A    I'm not sure the exact business arrangement they have
but I know they have an affiliation which is why we go there.
```

385.　Notably, transcribed wiretaps from the USA v. Rose matter (involving convictions for fraudulent lawsuits, runners, and medical providers) revealed a recorded conversation wherein the manager of one of the clinics advised Rose that if he wanted to get into business with the CitiMed locations, he had to go through Yan Moshe.

92. Rose continues to increase the number of clinics in his New York network as he explained to a male referred to as Alex in call 9666. During their conversation, Rose explained that he (Rose) was working with City Med clinics[79] (who are affiliated with an individual named Yan Moshe[80]) and his (Moshe/City Med) "marketing guy" Rob (Reuven Alon). The potential for this work relationship was apparently confirmed in call 9672 in which Rose spoke to a female he referred to as Marina. She explained that she personally oversees all of the clients that are sent to the Gun Hill Road clinic and offered to make sure that his clients are scheduled on time and that they have proper transportation and wait times. Rose explained that he was trying to meet with Yan to discuss this and following a meeting with Yan, Rose would connect Marina with his call center/office. At the conclusion of their conversation, Marina again explained that Rose should tell Yan that she was personally wiling to oversee Rose's Gun Hill clinic clients, as she is currently doing the same for some attorneys and all have been happy with her service.[81]

386. **On September 9, 2019, Gallina performed a three (3) level cervical fusion at Hudson Regional Hospital on Claimant G,** *on a 71-year old stage 4 cancer patient, for Gallina's and his conspirators' financial benefit.*

387. In performing this surgery, Gallina "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of the Fraud Scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952.

388. Claimant G had two follow-ups in the two (2) weeks after surgery, then ceased treatment with Gallina for 3.5 years (coinciding with trial preparations).

389. On March 1, 2023, five (5) years after date of purported accident, Gallina once again suggested a multi-level fusion – due to a thoroughly unsurprising inability of the now 75-year-old late stage cancer patient to recover through PT, yoga or pilates, and a purported fear of side effects of injections (as opposed to several levels of metal in the spine).

**Plan:**
He has failed conservative treatment consisting of physical therapy, anti-inflammatory medication, pilates and/or yoga. We discussed the role of injections. He has decided not to have these injections as he is fearful of the side affects of the medications and deems these to be temporary in nature.
I am recommending an L3-L4, L4-L5, L5-S1 Ant/Post fusion with laminectomy.

390. Gallina faxed his reports, with knowingly false contents, material misrepresentations, and material omissions, in furtherance of the Fraud Scheme, to opposing counsel on the matter on or about September 24, 2019, in violation of 18 USC § 1343.

391. On February 2, 2023, Claimant G received MRIs from Dr. Steven Winter, a radiologist who previously was subject to $3.57 million in penalties for submitting false claims related to providing MRI services.[12]

392. Claimant G received EMGs on February 20, 2023 and March 6, 2023 (5 years after accident), by Dr. Ali Guy, who dropped out of college with a 2.226 GPA and could not get into a US-based medical school, but currently and frequently acts as an "expert witness."

---

[12] https://www.justice.gov/archives/opa/pr/mri-diagnostic-testing-company-imagimed-llc-and-its-former-owners-and-chief-radiologist-pay

Q    Is there anything on either this résumé or
the website that indicates you never finished your
undergraduate college degree?

        A    No.  I don't have to.

        Q    Well, if patients or potential patients
knew that you never completed your undergraduate
degree, do you think they would have more questions
about your education?

        A    No.

        Q    All right.  And you testified in a case
called ████████?

        A    Yes.

        Q    That your GPA was 3.2?

        A    That's what I thought it was.  I was never
asked that question before, so, yes, that is
correct.

        Q    All right.  So what was your GPA when you
left Queens College?

        A    Two point two two six.

        Q    Okay.  You've testified previously that as
a result of -- you have no college degree from
anywhere, right?

        A    That is correct.

        Q    Okay.  And that fact does not appear on
your CV, correct, that you have no college degree?

        A    Correct.  Doesn't have to.

> Q    Okay.  And you have testified that as a
> result of not getting a college education -- excuse
> me -- a college degree in the United States you did
> not apply to a single medical school in the United
> States?
>
> A    You have it incorrect.  Because my grades
> were not good enough I did not apply to any school
> in the United States.  There are programs in United
> States that only two years of college is required
> such as Sophie Davis, so my grades were not good
> enough.  I did not apply.  I applied to only one
> medical school in Dominican Republic.  I was
> accepted.  I went.  I lived there for a few weeks.
> I fell in love with the country and the culture and
> the people.  I went there.  In retrospect it was one
> of the best decisions I ever made.
>
> Q    What medical schools in the United States
>
> do you claim you can get into or could have gotten
> into in the late '70s with no college degree?
>
> A    Me, none.  But there are programs.  If
> your grades are good, you could get into Sophie
> Davis.  It's a combined college and medical school.

393.    On or about September 17, 2018, at Subin Firm's direction, Robert Eisen of Subin Firm filed a Verified Summons & Complaint in Claimant G's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

394.    On or about March 15, 2019, at Subin Firm's direction, an unidentified attorney from Subin Firm mailed a Verified Bill of Particulars with knowingly false contents and material

omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

395.    On or about October 3, 2019, at Subin Firm's direction, an unidentified attorney from Subin Firm mailed an Amended Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

396.    On or about December 10, 2019, at Subin Firm's direction, an unidentified attorney from Subin Firm mailed a Supplemental Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

397.    Claimant G's case was ultimately settled in 2023.

### viii.   Claimant H

398.    Claimant H claimed injury as a result of a trip and fall incident on August 8, 2018 at approximately 10 pm. Claimant H signed a power of attorney form with Subin Firm on August 13, 2018. Upon information and belief, Claimant H was recruited by the Runner and/or Support Defendants. Just prior to the case's inception, Claimant H had been living in a shelter.

399.    On the date of purported accident, Claimant H, a 36-year-old man, was found approximately six (6) minutes after a 911 call was placed, lying supine on the sidewalk with complaints of left-sided back pain and claimed initial impact on his knees from tripping on the sidewalk. No head or neck pain was noted. Claimant H's records are attached as **Exhibit 7-H**.

**Narrative History Text:**
35 Y/O M PT FD LYING SUPINE ON SIDEWALK ALERT. PT STATES HE TRIPPED ON SIDEWALK, C/O BACK PAIN. PT STATES HE FELL TO HIS KNEES FIRST BUT HAS PAIN IN MIDDLE OF BACK ON L SIDE. NEG HEAD OR NECK PAIN, NEG N/V DIZZINESS, NEG LOC. POS PULSE, MOTOR, SENSORY X4 EXTREMITIES.

400.    The phone number provided to first responders and at the hospital has never been registered to Claimant H, nor anyone for that matter, and appears to have been a "burner" number.

401.    Claimant H was brought to the hospital, where his initial complaints were lower back pain, left knee pain, and left elbow pain. These complaints later became that he slipped and fell, and was suffering from "right foot pain and multiple joint pains." There was no visible swelling. His ultimate clinical diagnosis was generic "muscle pain." The precise complaints got no clearer throughout the stay:

**Pain Intensity Scale**
0-10 Pain Intensity Scale :   Yes

**0-10 Assessment**
Primary Pain Location :   Generalized

402.    At around 1 am on August 9, 2018, after having been at the hospital for approximately 2.5 hours, Claimant H claimed he fell "a few days ago, now has generalized pain all over… [provided] some inappropriate answers to questions. Denies PMH, states he cannot walk."

403.    At around 3 am on August 9, 2018, Claimant H claimed he fell in the street. The complaints were now back, both knees, left elbow and right foot. The provider notes Claimant H refuses to ambulate, and notes "no swelling, not tingling, no numbness, and no redness. The degree at present is minimal."

404.    Physical examination revealed each complained of body part had full range of motion and no objective indication of injury, only subjective tenderness complaints.

> **Back:** Normal range of motion
> **Musculoskeletal:** Moving all extremities spontaneously. left elbow: FROM, minimal TTP, no deformity, no swelling; right foot: TTP on doirsal aspect diffusely, no swelling, no deformity: bilateral knees: anterior TTP, no swelling, no deformity, FROM NV intact bilateral UE and LE.

405.    Diagnostic imaging was negative. Claimant H was discharged.

406.    As with Claimant E, at EBT, Claimant H testified that the first person he treated with was the surgeon involved; here, McCulloch, who Claimant H claimed he saw in September, who is the one that provided his various referrals. As with Claimant E, there is no record of this.

407.    On October 9, 2018, two (2) months after the purported accident, Claimant H, without any referral, consultation, or evaluation, shows up for PT at All Boro. Complaints were noted for the cervical, lumbar, and foot, with no notation of complaints of the knee. The subjective portion provided complaints of "pain and stiffness in his neck/upper back, mid/lower back, and foot." Claimant H again showed up for PT without an evaluation on November 26 and November 27, 2018. On the 26th complaints were limited to the neck and traps area. On the 27th was precisely the same.

408.    On November 30, 2018, nearly three (3) months post-purported accident, Claimant H visited All Boro and purportedly had their initial evaluation. It is one page, with the Claimant's date of birth missing, no signature block, no plan of care. Claimant H now claimed he fell on a sidewalk in a construction site, injuring his left knee and entire back. It was noted that "The patient was referred to physical therapy. He had a couple of courses of physical therapy, but when he felt that it does not provide relief, he started to seek medical attention." Who referred Claimant H to physical therapy is not referenced. The fact Claimant H has, prior to that week, been to physical therapy once in the three (3) months after the accident was not addressed. The physical therapy referral slip attached to this evaluation suggests he consulted with Karafin.

409.    Upon return to the physical therapist at All Boro on December 7, 2018, the knee complaint has once again vanished. On December 11, 2018, for the first time in the PT records, a knee complaint was referenced; however, it appears to have been added after the fact:



410.    The following day, December 12, 2018, the knee complaint was once again not referenced, nor does it appear in the January 4, 2019 PT record.

411.    On January 18, 2019, Claimant H consults with Weiner, who reiterates Kolb's MRI misreadings and refers Claimant H for EMGs to purportedly determine whether injections or surgical intervention is more appropriate. Karafin purportedly performs the EMG tests on March 3, 2019. The record reflects solely the raw reading and a partial data table without interpretation, impression, or signature. The paraspinal EMG table was left blank.

412.    On April 8, 2019, despite the purported need for EMG testing to make a determination between surgery or injections, Weiner's report began with "The patient needs to continue working until he finishes probation before he can have the surgical intervention," strongly suggesting same was already the pre-determined conclusion. There was no consideration or discussion of the EMG results or possible injections in the report. There was no discussion of risks or what the planned procedure was. After simply reiterating Kolb's MRI misreadings, Weiner

simply concluded "When he is cleared to return from probation, he will have his surgical intervention."

413. On June 3, 2019, Claimant H returned to Weiner. Despite that the last report claimed Claimant H needed to keep working until he finished probation, Weiner notes Claimant H had been out of work from the injury. Despite the report from January suggesting surgical versus injections were to be considered, then in April stating Claimant H was moving forward with surgery once off probation, Weiner, without any explanation whatsoever, gave Claimant H an injection.[13]

414. The June 3, 2019 record concluded with Weiner recommending that Claimant H "is to follow up with the orthopedic surgeon for possible surgical intervention," and that Claimant H "start a course of physical therapy" – which Claimant H had purported long since started.

415. On November 22, 2019, Claimant H returned to Weiner post-surgery, who performed an additional injection.[14]

416. All Boro mailed their reports, with knowingly false contents, material misrepresentations, and material omissions, in furtherance of the Fraud Scheme, to Subin Firm on or about September 13, 2019, in violation of 18 USC § 1341.

417. Claimant H received MRIs from Kolb in December 2018. In possibly the most egregious misreading of the bunch, Kolb manufactured a fracture, an ACL tear, and an MCL tear.

418. Kolb's findings, yet again, were contradicted by later independent review:

    a. As to the left knee MRI: "The anterior and posterior cruciate ligaments appear intact, as does the medial collateral ligament and lateral collateral ligamentous

---

[13] Of the kind he was prohibited from ever doing again after a 70+ page finding of incompetence, unnecessary overtreatment, and poor record-keeping.

[14] Of the kind he was prohibited from ever doing again after a 70+ page finding of incompetence, unnecessary overtreatment, and poor record-keeping.

structure inclusive of the popliteus tendon… The original interpreting radiologist describes "a 2.5 cm subchondral nondisplaced trabecular fracture of the medial tibial spine". It is in the undersigned opinion that this represents subchondral edema and not a fracture. This is seen in the setting of thinning of the articular cartilage within the medial tibiofemoral compartment. Additionally, there is no evidence of a significant joint effusion or lipohemarthrosis. No soft tissue swelling is noted overlying the joint space. There is a flap tear extending through the posterior horn and body of the medial meniscus with horizontal morphology on cross-section. This is seen in the setting of moderate osteoarthritis within the medial compartment as previously described by thinning of the articular cartilage and subchondral bone marrow edema within the medial tibiofemoral compartment. The findings are reflective of a degenerative meniscal tear, which is seen in the setting of osteoarthritis. Evaluation of this MRI examination reveals no causal relationship between the claimant's alleged accident and the findings on this MRI examination."

b. As to the December lumbar MRI: "Magnetic resonance imaging of the lumbar spine demonstrates a mild diffuse disc bulge at L4-L5 with effacement of the thecal sac. There is no evidence of central canal spinal stenosis or neural foraminal narrowing. There is a central disc bulge at L5-S1 with effacement of the thecal sac. There is no evidence of central canal spinal stenosis or neural foraminal narrowing. The above findings are seen in the setting of desiccation of the L4-L5 and L5-S1 intervertebral disc space levels, which is consistent with degenerative disc disease and suggestive of a chronic degenerative process

as opposed to an acute traumatic event. Additionally, disc bulges in the lumbar spine will be seen in up to 63% of asymptomatic individuals (Jensen, MC, et al. New England Journal of Medicine, 1994; 331: 369-373), thus findings are frequently nonspecific. Disc bulges with thecal sac compromise or central protrusions and extrusions without significant neural foraminal compromise are clinically insignificant."

419.    Kolb faxed his reports, with knowingly false contents, material misrepresentations, and material omissions, in furtherance of the Fraud Scheme, to opposing counsel on the matter on or about September 11, 2019, in violation of 18 USC § 1343.

420.    Between January and March of 2019, Claimant H purportedly attended PT at Urban Heights Medical PC. It is literally 16 copies of the same piece of paper with a different date. The same 3 modalities are provided every time.  There is no evaluation of either the patient or the response to treatment.  Every visit is a checkbox and a stamped signature with identical "subjective portions. 16 pages of the same report.



421.     Between April 8, 2019 and October 3, 2019 Claimant H purportedly attended PT at Bestcare. The unidentified signatures, the address, and the report format are identical to Urban Heights. The same 5 modalities are provided every time.  There is no evaluation of either the patient or the response to treatment.  Every visit is a checkbox and a stamped signature by one of two people (who are not identified), with the only difference being the date; each report, other than date is exactly identical, the subjective portion for all 12 visits for the left unidentified signature is verbatim the same.  The 19 visits for the right unidentified signature uses a rotation of the same 3 statements.



12 copies of this piece of paper.          19 copies of this piece of paper.

422.     Bestcare and Urban Heights mailed their reports, with knowingly false contents, material misrepresentations, and material omissions, in furtherance of the Fraud Scheme, on or about October 15, 2019, in violation of 18 USC § 1341.

423. On January 31, 2019, Claimant H visited NY S&J for their initial evaluation. Just after Claimant H's initial evaluation, on February 1, 2019, McCulloch recommended surgery for Claimant H's left knee.

424. On July 11, 2019, Claimant H received left knee surgery performed by McCulloch at New Horizon Surgical Center in New Jersey, upon information and belief, performed over state lines in conjunction with a financial compensation scheme – a kickback. In performing this surgery, McCulloch "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of the kickback and Fraud Scheme, and in fact did so, in violation of the Travel Act, 18 U.S.C. § 1952.

425. The New Horizon records indicate the procedure was paid for by funding related to a date of accident August 10, 2018 and identified the insurer as the Subin Firm. The proffered admitting diagnosis and procedure was detailed as:

Left knee traumatic ACL probable complete tear, meniscus tear, medial collateral ligament partial tear. ACL tear.

Left knee arthroscopic debriedment, ACL Recon

426. The "Additional Ref. Doctors" is listed as Subin Firm.

**Additional Ref. Doctors**
Referral Source          Subin & Associate (212-285-3800
                         150 Broadway, New York, NY 10038)

427.    The surgery was directly funded by the Funding Defendants; McCulloch still asserted a lien for ~$8,000 regardless.



428.    On July 11, 2019, on the date of surgery at New Horizon, Claimant H was prescribed crutches by McCulloch, on a lien, from a company called Sabas NY Services Inc. That business is run by Arthur Yusupov whose listed phone number connects to a CitiMed clinic – where he is employed as a PA.

429.    Upon information and belief, McCulloch either did not perform what he claimed to, or perhaps worse, did in fact perform removal and reconstruction of an intact ACL. Notably, records from other matters indicate McCulloch also performed a hand surgery that day in New Jersey, and was able to be back in the office in Manhattan, seeing more patients the same day.

430.    McCulloch emailed his reports, with knowingly false contents, material misrepresentations, and material omissions, in furtherance of the Fraud Scheme, to opposing counsel on the matter on or about August 9, 2022, in violation of 18 USC § 1343.

431.    All of Claimant H's treatment was paid through by liens and funding, despite no corresponding UCC statement having been filed. Claimant H testified at EBT that he in fact had Medicaid.

432.    On or about March 21, 2019, at Subin Firm's direction, Gene Chertock of Subin Firm filed a Verified Summons & Complaint in Claimant H's matter. The Summons & Complaint, with knowingly false contents, material omissions, and a false verification, was filed through NYSCEF, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1343.

433.    On or about August 13, 2019, at Subin Firm's direction, an unidentified attorney from Subin Firm mailed a Verified Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

434.    On or about September 16, 2021, at Subin Firm's direction, Gene Chertock from Subin Firm mailed a Supplemental Bill of Particulars with knowingly false contents and material omissions to opposing counsel in the matter, in furtherance of the Fraud Scheme, and in violation of 18 USC § 1341.

435.    Claimant H's case was ultimately settled in 2023.

## VI.    PLAINTIFFS' JUSTIFIABLE RELIANCE

436.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct.

437.    The mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Plaintiff was forced to rely on the misrepresentation of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these are actions Plaintiff would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants. The numerous subsequent Supplemental Bills of Particulars filed related to fraudulent treatment rendered through the Fraud Scheme were

further relied upon, by necessity, in prolonged and unnecessary legal costs, independent medical examinations, experts, investigations, and other expenses.

438.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments were made after Plaintiff had engaged in reasonable due diligence and were made in reasonable and justifiable reliance on the submitted material and proceedings.

## VII.    DAMAGES

439.    Plaintiff is an insurance carrier which underwrites policies that cover the various claims and lawsuits filed and prosecuted by Claimants and the Legal Defendants, with the necessary and substantial assistance of the Medical Defendants, the Runner Defendants, and the Funding Defendants, as part of the Fraud Scheme.

440.    As a result of the Fraud Scheme, Plaintiff has incurred substantial damages. Such damages include the payments that Plaintiff made to Legal Defendants in the form of settlements due to Defendant's pattern of fraudulent conduct. Damages also include payments Plaintiff made as legal and investigative costs for defending fraudulent lawsuits and/or for reimbursement for payments made as part of settlement which were diverted to Defendant Medical Providers through liens for treatment predicated upon, in whole or in part, the fraudulent reports generated by Defendants.

441.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the

scheme is designed reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

442.    New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit - even if the allegations are false or groundless, the insurer has a duty to defend its insured. By law, each and every fraudulent claim and lawsuit immediately and directly triggered mandated expenses by Plaintiff in discharging its duty to defend its insured.

443.    Each transmission of records of fraudulent medical treatment rendered (or falsely recorded) had the direct and immediate effect of causing additional damages through Plaintiff's further incurred fees and costs in discharging its legal obligation to provide a defense to its insured, through prolonged litigation, the need for experts, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement in figures that were fraudulently inflated.

444.    Further, Plaintiff's business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

## COUNT I
## RICO Violation (§ 1962(c))

**Against (collectively, "Count I Defendants"):**

**SUBIN ASSOCIATES, LLP,
NEAL MAGNUS,
ALL BORO MEDICAL REHABILITATION PLLC,
KEVIN H. WEINER, M.D.,
FELIX KARAFIN, M.D.,
NY ORTHOPEDICS, P.C. s/d/b/a SPINECARENYC,
MICHAEL GERLING, M.D.,
MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.
s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS,
KENNETH MCCULLOCH-OTERO, M.D.,
KOLB RADIOLOGY PC, and,
THOMAS KOLB, M.D.**

445.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

446.    At all times relevant herein, Count I Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Count I Defendants participated in the operation or management of the enterprise, which Subin Firm orchestrated, coordinated and led.

447.    In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Count I Defendants. See, *supra*.

448.    Each of the Count I Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

449. The Count I Defendants engaged in a pattern of racketeering activity involving numerous predicate acts in the conduct of the Enterprise as described in detail supra, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bribing a witness under New York law (NY Penal Code § 215), money laundering (18 U.S.C. §§ 1956 and 1957) and violations of the Travel Act (18 U.S.C. § 1952) – each being "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

450. The predicate acts of mail fraud, wire fraud, bribing a witness or victim, Travel Act violations, and money laundering, all involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

451. Each Defendant engaged in a pattern of racketeering activity in the conduct or in participation of the conduct of the Fraud Scheme Enterprise's conduct as follows:

### SUBIN ASSOCIATES, LLP

| September 17, 2018 | G | 18 USC § 1343 | Filed Verified Summons & Complaint in furtherance of Fraud Scheme over the wires *via* NYSCEF. |
| March 15, 2019 | G | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| March 21, 2019 | H | 18 USC § 1343 | Filed Verified Summons & Complaint in furtherance of Fraud Scheme over the wires *via* NYSCEF. |
| May 29, 2019 | D | 18 USC § 1343 | Filed Verified Summons & Complaint in furtherance of Fraud Scheme over the wires *via* NYSCEF |
| August 13, 2019 | H | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |

| February 1, 2020 | D | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
|---|---|---|---|
| February 12, 2020 | C | 18 USC § 1343 | Mailed Supplemental Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| November 19, 2020 | D | 18 USC § 1341 | Mailed Supplemental Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| April 30, 2021 | B | 18 USC § 1343 | Filed Verified Summons & Complaint in furtherance of Fraud Scheme over the wires *via* NYSCEF |
| July 17, 2021 | F | 18 USC § 1343 | Filed Verified Summons & Complaint in furtherance of Fraud Scheme over the wires *via* NYSCEF |
| September 16, 2021 | H | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| April 25, 2022 | C | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| April 27, 2022 | F | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| March 2, 2023 | A | 18 USC § 1343 | Filed Verified Summons & Complaint in furtherance of Fraud Scheme over the wires via NYSCEF |
| July 11, 2023 | A | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| July 25, 2023 | D | 18 USC § 1341 | Mailed Verified Bill of Particulars with false contents and omissions in furtherance of Fraud Scheme |
| March 2, 2018 | N/A | 18 USC § 1956 18 USC § 1957 18 USC § 1343 | Fraudulent disbursements of funds post-Peralta matter, including recompense to funding company which was in fact diverted to Elefterakis (in excess of 10k), payoff of WS Advance (in excess of 10k), and payoff of Hernandez Associates |

**NEAL MAGNUS**

| June 24, 2019 | H | 18 USC § 1341; NY PL 215.00 | Caused mailing of check to McCulloch in furtherance of fraud scheme; intended to induce McCulloch as a witness and his expected testimony thereto |
|---|---|---|---|
| January 6, 2023 | N/A | 18 USC § 1956; 18 USC § 1957; 18 USC § 1343 | Paid out on Claimant EHS advances (original advance arranged prior to date of accident) by non-party liberty funding, upon information and belief, by way of wire, and in an amount greater than 10k, in a transaction disguised to conceal the nature of the proceeds from specified unlawful activity |
| June 12, 2021 | N/A | 18 USC § 1343 18 USC § 1341 | Created false documentation indicating an accident date of June 23, 2021 and an agreement date of June 28, 2021 on a document in fact created on June 12, 2021, which foreseeably caused transmission of such document and caused a check to be mailed in furtherance of fraud scheme. |
| August 2022 | N/A | 18 USC § 1341 | Mailed check to Ramirez-Naranjo in furtherance of fraud scheme. |

**ALL BORO MEDICAL REHABILITATION PLLC**

| September 13, 2019 | H | 18 USC § 1341 | Mailed false medical records to claim Defense Counsel in furtherance of Scheme |
|---|---|---|---|
| June 12, 2020 | E | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| July 22, 2020 | C | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| September 20, 2020 | D | 18 USC § 1343 | Faxed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| January 21, 2025 | F | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| April 2, 2019 | G | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

## KEVIN H. WEINER, M.D.

| | | | |
|---|---|---|---|
| April 2, 2019 | G | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| September 13, 2019 | H | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| June 12, 2020 | E | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| September 20, 2020 | D | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| January 21, 2025 | F | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

## FELIX KARAFIN, M.D.

| | | | |
|---|---|---|---|
| July 22, 2020 | C | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| September 20, 2020 | D | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| June 12, 2020 | E | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| January 21, 2025 | F | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| April 2, 2019 | G | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

## NY ORTHOPEDICS, P.C.

| July 9, 2019 | E | 18 USC § 1343 | Faxed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
|---|---|---|---|
| July 15, 2020 | E | 18 USC § 1343 | Faxed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| June 23, 2023 | C | 18 USC § 1343 | Emailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| December 6, 2020 | F | 18 USC § 1343 | Knowingly and foreseeably caused emailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

## MICHAEL GERLING, M.D.

| July 9, 2019 | E | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
|---|---|---|---|
| July 15, 2020 | E | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| June 23, 2023 | C | 18 USC § 1343 | Knowingly and foreseeably caused emailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| December 6, 2020 | F | 18 USC § 1343 | Knowingly and foreseeably caused emailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

## MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.

| June 7, 2020 | E | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
|---|---|---|---|
| June 8, 2020 | E | 18 USC § 1343 | Faxed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

| October 8, 2020 | D | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
|---|---|---|---|
| August 9, 2022 | H | 18 USC § 1343 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

### KENNETH MCCULLOCH-OTERO, M.D.

| May 2, 2019 | D | 18 USC § 1952 | Made use of interstate facilities in travelling to New Jersey intending to perform knowingly unnecessary surgery in furtherance of kickback scheme and Fraud Scheme, performed such surgery |
|---|---|---|---|
| June 24, 2019 | H | 18 USC § 1341; NY PL 215.05 | Made use of the mails in receiving a check from Best Case intended to induce McCulloch's favorable testimony as a witness |
| July 11, 2019 | H | 18 USC § 1952 | Made use of interstate facilities in travelling to New Jersey intending to perform knowingly unnecessary surgery in furtherance of kickback scheme and Fraud Scheme, performed such surgery |
| July 24, 2020 | D | 18 USC § 1952 | Made use of interstate facilities in travelling to New Jersey intending to perform knowingly unnecessary surgery in furtherance of kickback scheme and Fraud Scheme, performed such surgery |
| October 8, 2020 | D | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| August 9, 2022 | H | 18 USC § 1343 | Knowingly and foreseeably caused emailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

### KOLB RADIOLOGY PC

| September 11, 2019 | H | 18 USC § 1343 | Faxed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
|---|---|---|---|
| August 17, 2023 | D | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

| March 23, 2023 | B | 18 USC § 1343 | Faxed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| May 16, 2023 | G | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| July 21, 2023 | A | 18 USC § 1343 | Emailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| December 6, 2024 | F | 18 USC § 1341 | Mailed false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

## THOMAS KOLB, M.D.

| September 11, 2019 | H | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| June 12, 2020 | E | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| March 23, 2023 | B | 18 USC § 1343 | Knowingly and foreseeably caused fax transmission of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| May 16, 2023 | G | 18 USC § 1343 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| July 21, 2023 | A | 18 USC § 1343 | Knowingly and foreseeably caused emailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| August 17, 2023 | D | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |
| December 6, 2024 | F | 18 USC § 1341 | Knowingly and foreseeably caused mailing of false medical records to underlying Defense Counsel in furtherance of Fraud Scheme |

452.     As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

  a.     An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

  b.     Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

  c.     Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

  d.     Such other relief as the Court deems just and proper.

<u>**COUNT II**</u>
<u>**RICO Violation (§ 1962(d))**</u>

**Against All Defendants**

453.     Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

454.     From at least 2012 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d). In more readily understood terms used by Hon. Esposito when discussing Defendant Gerling (*see supra*, ¶ 84, p. 23):

```
THE COURT:  They are all in cahoots
```

455.     The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) bribing a witness under New York law (NY Penal Code § 215.00), money laundering (18 U.S.C. §§ 1956 & 1957) and violations of the Travel Act (18 U.S.C. § 1952).

456.     The substantive 18 USC § 1962(c) violations are set forth in Count I.

457.     The predicate acts of mail fraud, wire fraud, bribing a witness or victim, money laundering, Travel Act violations, and securities fraud also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme or artifice to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

458.     These predicate acts were necessary steps in and in furtherance of the Fraud Scheme Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Defendants, including:

     a.   Recruiting Claimants and staging accidents;

     b.   Securing retainer of the attorneys within the Fraud Scheme Enterprise;

     c.   Managing Claimants through pre-determined protocol treatment;

     d.   Performing pre-determined and unnecessary surgeries;

     e.   Filing and prosecuting the fraudulent suits;

     f.   Laundering and concealing the nature of the Fraud Scheme proceeds; and,

     g.   Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

459.     Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme to the benefit of

the Fraud Scheme Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Count I. Each Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiffs and those similarly situated.

460.　As a direct and proximate result of the § 1962(c) violations that Defendants conspired to commit, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, and attorneys' fees.

461.　Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Defendants' agreement and the predicate acts committed in furtherance thereof, Plaintiff would not have suffered the losses described.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

a.　An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.　Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.　Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.　Such other relief as the Court deems just and proper.

<u>**COUNT III**</u>
<u>**RICO Violation (§ 1962[a])**</u>

**Against Best Case and Pegasus Defendants**
**(collectively, "Count III" Defendants)**

462.    Plaintiff incorporates herein by reference the allegations contained in the above

paragraphs as though set forth in their entirety.

463.    The advances made by Count III Defendants to Claimants directly and via

payments to Medical Provider Defendants are and were structured not as "loans" (which would

render the interest rates of the advances wildly usurious), but as a purchase of future receivables.

464.    When challenged, New York law has repeatedly held that these advances are not

"loans," but instead an "ownership interest" – an "investment."

| | |
|---|---|
| <u>Matter of Lynx Strategies LLC v Ferreira</u>, 957 NYS2d 636 (Sup Ct., NY County 2010) | "The concept of usury applies to loans, which are typically paid at a fixed or variable rate over a term. **The instant transaction, by contrast, is an ownership interest in proceeds for a claim, contingent on the actual existence of any proceeds.**" |
| <u>Kelly, Grossman & Flanagan, LLP v Quick Cash, Inc</u>., 950 NYS2d 723 (Sup Ct., Suffolk County 2012] | "**<u>Usury laws do not apply to investments</u>** (GOL § 5-501[2]). Where a transaction involves interest to be paid based upon a contingency which is in the control of the debtor, usury will not apply." |
| <u>Lawsuit Funding LLC v Lessoff</u>, 2013 NY Slip Op 33066[U], *10-11 (Sup Ct., NY County 2013) | "…the Sale Agreement and the Stipulation **are <u>not loans, but investments</u>, and are not subject to usury laws.**" |

465.    Since at least 2013, Best Case has funded thousands of claims which are the lifeblood of the Fraud Scheme, all while engaged in the Fraud Scheme and operating hand-in-hand with Subin Firm, Medical Provider Defendants, and other funders.

466.    Pegasus has funded over 15,000 claims and outlaid over a half billion dollars:



467.    Many have settled, or the advances have been bought out by another provider, and Count IV Defendants have recognized income from the pattern of racketeering identified as the Fraud Scheme.

468.    At least some part of that income has gone to the use of funding further advances to Claimants, both directly and to the Medical Provider Defendants, including, upon information and belief, Claimants and Medical Provider Defendants herein.

469.    Each of the transactions known, with the scale of such transactions unknown absent discovery and in the exclusive knowledge of Defendant, in which Best Case and Pegasus engages utilizes the mail and wires. Pegasus has moved its headquarters to Delray Beach, Florida, while continuing to fund New York Claimants who, as demonstrated herein, often receive surgeries in New Jersey, at times with such surgeries and facility costs directly funded by Pegasus. Best Case has been continually operated out of New Jersey, varying its headquarters between Magnus's home and a UPS store with an assigned mailbox.

470.    The investment of these funds into the operation of the Fraud Scheme Enterprise operations, as well as their investment in a secured interest directly tied to success of the scheme (essentially investing in a Fraud Scheme profit share), directly harmed Plaintiff. The extent of involvement with the Claimants herein, and the extent of damage caused to Plaintiff, can only be discovered through the discovery process.

471.    These investments also supported the commandeering of the judicial process into a fraudulent profit center for the Fraud Scheme Enterprise, infiltrating an institution epitomizing otherwise legitimate business.

472.    Upon information and belief, given the complex web of overlapping ownership, management, and control between Best Case, its parent company, and numerous other affiliated businesses detailed supra, at least a part of the illicit proceeds have been invested into separate enterprises that results in harm to others, as well as Plaintiff.

473.    Upon information and belief, given the complex web of overlapping ownership, management, and control between Pegasus, its parent companies PLF Group LLC and Cornix Holdings LLC, its international private equity financial backer Sandton Capital Partners, and its numerous other affiliated businesses detailed supra, at least a part of the illicit proceeds have been invested into separate enterprises that results in harm to others, as well as Plaintiff.

474.    The Count III Defendants' investments into the Fraud Scheme were essential to its operation.

475.    The Count III Defendants' investments paid surgeons for needless surgery, prolonging litigation and falsely inflating open claim values.

476.    For all the foregoing reasons, Plaintiff thus suffered an "investment injury" as a result of Count III Defendants' violations of 18 USC § 1962(a).

**WHEREFORE**, Plaintiff demands judgment against Count IV Defendants for:

a.   An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 USC § 1964;

b.   Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.   Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.   Such other relief as the Court deems just and proper.

## COUNT IV
## Common Law Fraud

**Against Legal Service Defendants and Medical Provider Defendants
(collectively, "Count IV Defendants")**

477.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

478.   As set forth in Counts I and II, which are incorporated by reference as if fully set forth herein, the Count IV Defendants made misrepresentations of facts, and deliberately concealed and omitted materials facts that they had a duty to disclose, in connection with their lawsuits and/or claims for payment under New York law.

479.   These misrepresentations of fact by the Count IV Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries, and the necessity of treatment. A list of such misrepresentations, who they were made by, and when, are detailed in the tables under Counts I, in addition to numerous others set forth *supra*.

480.   The Count IV Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. Count IV Defendants'

representations were false or required disclosure of additional facts to render the information furnished not misleading. The falsity of each such representation is set forth under Count I and the corresponding Claimant sections of this Complaint, *supra*.

481. The Count IV Defendants made these misrepresentations with the intent they reach Plaintiff and be relied upon thereto, and in furtherance of the Fraud Scheme to defraud Plaintiff by submitting claims for payment of general liability insurance proceeds, knowingly falsified treatment records, inflated liens, and other submissions presented to Plaintiff through the course of the Fraud Scheme. The Subin Defendants presented such misrepresentations directly to Plaintiff and/or its attorneys. The Medical Provider Defendants presented such misrepresentations in some instances directly to Plaintiff, or *via* the Subin Defendants as a conduit with Plaintiff as the intended recipient.

482. The Count IV Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate. The knowledge of such falsity can be reasonably inferred from the constellation of facts set forth in each Claimant section, *supra*.

483. Plaintiff reasonably and justifiably relied, to its detriment, on the Count IV Defendants' representations concerning their eligibility to receive payments of general liability insurance proceeds, the validity of such claims and treatment, and without knowledge of the Count IV Defendants' scheme and artifice to defraud them.

484. The Count IV Defendants knew, or should have known, that Plaintiff would rely on such representations, and planned to exploit such reliance.

485. But for the Count IV Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have incurred damages.

486.     As a matter of New York law, which requires Plaintiff to fulfill its duty to defend its insured immediately upon the filing of a claim or lawsuit, regardless of merit, and even in the face of suspected fraud, such reliance was thrust upon Plaintiff. Plaintiff was forced to take action it otherwise would not have taken, based on the contents of the false misrepresentations.

487.     Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, forced reliance upon Plaintiff to, at minimum, rely on such submissions in discharging its legal obligation to provide a defense to its insured, as well as necessarily resulted in prolonged litigation, required additional reserves, and in valuing the claim as to exposure and/or settlement within the parameters of discharging its legal duty to defend.

488.     As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

489.     Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count IV Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

490.     As a direct and proximate cause of the Count IV Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count IV Defendants, Plaintiff has been damaged. Plaintiff's damages include, but are not necessarily

limited to, settlement payments, administration costs, investigative and defense costs paid by Plaintiff to the Count IV Defendants or caused by the Count IV Defendants.

491.    Because the Count IV Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Count IV Defendants, and each of them, jointly and severally, for:

        a.       An award of Plaintiff's actual and consequential damages to be established at trial;

        b.       Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Count IV Defendants' illegal conduct; and,

        c.       Such other relief as the Court deems just and proper.

### COUNT V
### Aiding and Abetting Fraud

**Against All Defendants**

492.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

493.    All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count IV.

494.    As set forth in detail, supra, and in the charts set forth under Counts I and the factual body of the allegations *supra*, each Defendant engaged in overt acts in furtherance of the fraud, or otherwise provided substantial assistance to advance such fraud's commission.

495.    But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

496.    As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

497.    Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

   a.    An award of Plaintiff's actual and consequential damages to be established at trial;

   b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and,

   c.    Such other relief as the Court deems just and proper.

## COUNT VI
## Unjust Enrichment

**Against Legal Service Defendants and Medical Provider Defendants
(collectively, "Count VI Defendants")**

498.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

499.    As described above, the Count VI Defendants conspired to induce Plaintiff to make or expend numerous and substantial payments to them or others.

500.    The Count VI Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

501.    When Plaintiff paid the Count VI Defendants and others resulting from the Fraud Scheme, Plaintiff reasonably believed that it was legally obligated to make such payments based

upon the misrepresentations and omissions that the Count VI Defendants, or those persons working under their control, made concerning the Count VI Defendants' eligibility to make claims or seek reimbursement under New York law.

502.     Each and every payment that Plaintiff made or were caused to make to the Count VI Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Count VI Defendants sought and voluntarily accepted.

503.     Throughout the course of their scheme, the Count VI Defendants wrongfully obtained from Plaintiff benefit payments as a direct and proximate result of the unlawful conduct detailed above.

504.     Retention of those benefits by the Count VI Defendants would violate fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiff demands judgment against the Count VI Defendants, and each of them, jointly and severally, for:

    a.     An award of Plaintiff's actual and consequential damages to be established at trial; and

    b.     Such other relief as the Court deems just and proper.

## COUNT VII
## General Business Law § 349

**Against Legal Service, Medical Provider, and Funding Defendants
(collectively, "Count VII Defendants")**

505.     Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

506.     New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any

service in this state are hereby declared unlawful," and (h) "any person who has been injured by reason of any violation of this section may bring an action... to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

507. It is well-established that virtually all commercial activity which involves goods or services rendered to public consumers, including rendering legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349.

508. It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, and intent to defraud and justifiable reliance are not elements of a statutory claim.

509. As set throughout this Complaint, supra, each of the Count VII Defendants have engaged in deceptive acts and practices in the conduct of their businesses; particularly, in the furtherance of the Fraud Scheme.

510. GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff.

511. The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damages caused instant deceptive acts and practices in furtherance of the Fraud Scheme. The Fraud Scheme itself has a broader impact on consumers at large.

512. The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally – clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards - and nationally, wrongfully driving up the cost of legitimate insurance business operations, resulting in

needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (i.e., everyone).

513.    This phenomenon and its effects have recently begun to attract media attention. New York Post, June 16, 2024: MS-13, Russian mobsters use migrants in elaborate injury scam — even getting spinal surgery to pull it off ("Insurance insiders claim losses have tripled since the pandemic, with payouts so massive they're driving up the cost of living for all New Yorkers… The scams are ballooning costs for insurance, housing, construction, food, utilities, and basic living expenses"); ABC News, October 4, 2024: 7 On Your Side investigation finds dozens of injury lawsuits from people living in same apartment buildings ("We have a system that allows for fraudulent claims, leads to million dollars settlements and it raises the cost of insurance premiums across the board," Brian Sampson, president of the Empire State Chapter of the Associated Builders & Contractors, said. "We need to find a way to get it to stop."); ABC News, March 17, 2024: Construction workers in NY faking falls on sites part of larger fraud scheme, lawsuit claims ("'These fraudulent acts have emerged as widespread insurance scams which lead to inflated costs in construction and housing throughout New York State,' said Assemblyman David Weprin.").

514.    The deceptive trade practices of the Count VII Defendants – the Fraud Scheme – occurred and is continuing to occur in New York, Count VII Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

515.    Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count VI Defendants are liable to Plaintiff for compensatory damages and the attorneys' fees incurred in bringing and prosecuting this Action.

**WHEREFORE**, Plaintiff demands judgment against Count VII Defendants for:

a. An award of Plaintiff's actual damages to be established at trial;

b. Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and,

c. Such other relief as the Court deems just and proper.

## COUNT VIII

### Attorney Misconduct (New York State Judiciary Law § 487)
### (Against Subin Defendants)

516. New York State Judiciary Law § 487 provides that:

An attorney or counselor who:

1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,

2. Wilfully delays his client's suit with a view to his own gain…

… in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

517. Judiciary Law § 487 is a statute that has its "ancient origins" in the penal law and its "intent is to enforce an attorney's special obligation to protect the integrity of the courts and foster their truth seeking function."

518. Unlike common law provisions, its statute's intent is not to make a Plaintiff whole. The statute is to punish and deter. It is particularly well-suited to chronic patterns of violative conduct as alleged here.

519. Judiciary Law § 487 does not encompass the filing of a pleading or brief containing non-meritorious legal arguments, noting that lawyers are permitted to zealously advocate on behalf

of their clients - it <u>does</u>, however, encompass "[w]hen a party commences an action grounded in a material misrepresentation of fact," as "the opposing party is obligated to defend or default and necessarily incurs legal expenses."

520.    Each and all of the underlying Claimant matters took place within State Courts within the Second Department of the State of New York Unified Court System; the Second Department has expressly held vicarious liability may attach to a firm for the conduct of its attorneys.

521.    The Subin Firm Defendants' alleged misrepresentations, as set forth herein and summarized under Count I, were made in the course of litigation.

522.    The Subin Firm Defendants engaged in pervasive deceit and colluded with Claimants, Runners, Medical Service Defendants, and others with the intent to deceive both the Court, the named adversarial parties, and the Plaintiff herein as the true party in interest in each underlying Claimant matter.

523.    The Subin Firm Defendants further willfully delayed their clients' suits to their own gain, through intentionally prolonged litigation to render unwarranted medical services, accrue interest on the part of Funding Defendants, and to buttress their inventory-based credit lines.

524.    Plaintiff, harmed directly as a result of the precise conduct held actionable by the New York Court of Appeals, and suffering damages in the precise manner deemed compensable by the New York Court of Appeals, is the party injured, and is entitled to recover treble damages thereby.

**WHEREFORE**, Plaintiff demands judgment against the Legal Service Defendants for:

a.    An award of treble Plaintiff's actual damages to be established at trial; and,

b.    Such other relief as the Court deems just and proper.

**IX.      JURY TRIAL DEMAND**

525.      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims.

Dated: August 13, 2025

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**


By:  */s/ William J. Clay*                                        
   **WILLIAM J. CLAY**
   **MICHAEL A. GRAVES**
   **DANIEL A. JOHNSTON**
   **AARON E. MEYER**
   1985 Forest Lane
   Garland, Texas 75042
   Telephone:  214-736-9433
   Facsimile:  214-736-9994
   Service Email: service@thewillislawgroup.com

   ***ATTORNEYS FOR THE PLAINTIFF***
   **UNION MUTUAL FIRE INSURANCE**
   **COMPANY**